73 A.3d 543

Lisa KINNEY–LINDSTROM as Parent and Natural Guardian of Samantha Lindstrom, a Minor, and Alec Lindstrom, a Minor, and as the Assignee of Dr. S., Appellant/Cross–Appellee

v.

MEDICAL CARE AVAILABILITY AND REDUCTION OF ERROR FUND, Successor in Interest to the Medical Professional Liability Catastrophe Loss Fund, Appellee/Cross–Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 27, 2012.

Decided Aug. 19, 2013.

54 

James J. McEldrew, III, Esq., McEldrew Law, Philadelphia, Howard Jonathan Bashman, Esq., Willow Grove, for Lisa Kinney–Linstrom.

Elit R. Felix, II, Esq., Margolis Edelstein, Philadelphia, Arthur F. McNulty, Esq., PA Department of Insurance, for Medical Care Availability and Reduction of Error Fund.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY, and ORIE MELVIN, JJ.

### *OPINION*

Justice BAER.

These appeals involve a declaratory judgment action filed by Lisa Kinney–Lindstrom ("Mother") against the Medical Care Availability and Reduction of Error Fund ("MCARE Fund"). Mother seeks a ruling as to the number of "occurrences" for which the MCARE Fund is liable based on allegations that her physician failed to diagnose in a timely manner discrete in utero infections suffered by her twins, which caused severe injuries to both children. The Commonwealth Court granted summary judgment in favor of the MCARE Fund, holding that the physician's failure to diagnose Mother's infection constituted the single cause of the children's injuries, and, therefore, there was a single occurrence, limiting MCARE coverage to the statutory limit of one payment of $1 million. We reverse, and hold that the Commonwealth Court erred by

granting summary judgment because there is a genuine issue of material fact as to whether the children's injuries arose from the physician's failure to diagnose a single infection, or whether the children's injuries resulted from the physician's failure to diagnose multiple infections from different organisms that infected each child in utero at different times. Accordingly, we reverse, and remand for trial on this issue.

These appeals further seek a declaration as to whether the MCARE Fund is liable to a health care provider on a claim for indemnification for delay damages and post-judgment interest based on an underlying medical malpractice jury verdict that exceeded the MCARE Fund's $1 million coverage limit. For the reasons set forth below, we affirm the Commonwealth Court's ruling that the MCARE Fund may be liable to a health care provider on a claim for indemnification of delay damages and postjudgment interest on an amount that exceeds its $1 million coverage limit, but that it is not liable under the facts presented herein because the MCARE Fund's refusal to make an offer of settlement was reasonable.

The record establishes that on May 2, 2003, Mother filed a medical malpractice action against Dr. S.[1] in the United States District Court for the Eastern District of Pennsylvania.[2] Therein, she alleged that Dr. S. failed to diagnose that her twins, Alec and Samantha, suffered from separate chorioamnionitis infections arising at different times prior to their births on November 4, 1995, which caused each of them to suffer permanent serious injuries. Because the case involved "extended claims" as defined in 40 P.S. § 1303.715(a),[3] the

1. Both the parties and the lower courts have used an abbreviation, as opposed to Dr. S.'s full name.

2. A second physician and a hospital were also named as defendants, but are not parties to the current action.

3. Generally, the MCARE Fund provides only a $500,000 (at this time) secondary layer of liability insurance coverage to health care providers and pays damages awarded in medical professional actions that exceed the $500,000 of professional liability insurance the MCARE Act requires providers to maintain. 40 P.S. § 1303.712. These claims governed by Section 712 of the MCARE Act are often referred to as "excess claims." However, for claims filed more than four years after the tort occurred, as presented herein, the MCARE Fund both defends the action and pays

MCARE Fund defended Dr. S., and also provided coverage of $1 million per occurrence. As explained *infra*, the parties discussed settlement, but the matter ultimately proceeded to trial.

Following trial, the jury made separate awards of damages for each child: $6.25 million for Alec's injuries and $6.9 million for Samantha's injuries, for a total verdict of $13.15 million. Mother filed a motion to mold the verdict to include delay damages, and Dr. S. filed post-trial motions. Thereafter, on August 23, 2006, Mother, Dr. S., and the MCARE Fund entered into a "Settlement Agreement, Assignment of Certain Rights and Provisional Full and Final Release" ("Agreement"), which provided as follows: (1) the MCARE Fund would make a single $1 million payment to Mother for the benefit of Alec and Samantha, plus a corresponding amount for delay damages and postjudgment interest; (2) Dr. S. would withdraw his post-trial motions following approval of the agreement; (3) Dr. S. would assign to Mother his right to litigate whether the MCARE Fund is required to pay a second $1 million for two occurrences of medical malpractice, and whether it is required to pay delay damages and post judgment interest on the remaining $12.15 million of the $13.15 million verdict; (4) Mother would bring a declaratory judgment action in Commonwealth Court to decide these issues; and (5) the MCARE Fund would waive any requirement that Mother exhaust her administrative remedies before filing the declaratory judgment action.

The federal court approved the Agreement and the MCARE Fund made one payment of $1 million to Mother, plus delay damages and postjudgment interest on that amount. Mother subsequently filed an original jurisdiction petition for review in the Commonwealth Court seeking a declaratory judgment on the two enumerated issues. First, she maintained that the MCARE Fund was liable for two "occurrences" and, thus, had

a limit of $1 million per occurrence (encompassing the $500,000 basic coverage limit and the $500,000 excess coverage limit). *Id.* § 1303.715(a), (b); *see also* n.4, *infra*, for the relevant statutory text. These claims governed by Section 715 of the MCARE Act are referred to as "extended claims."

to make two payments of $1 million under Section 715(b) of the Medical Care Availability and Reduction of Error Act, Act of March 20, 2002, P.L. 154, 40 P.S. § 1303.715(b) ("MCARE Act").[4] She contended that each of her fraternal twins became infected in utero by different organisms at different times, and that the MCARE Act could not deny each minor's substantive right to receive a separate $1 million payment. Petition for Review at 3, 5. Second, Mother, again standing in the shoes of Dr. S. by virtue of her assigned claim, argued that the MCARE Fund was liable for delay damages and postjudgment interest on the entire $13.15 million verdict because it was the MCARE Fund's breach of duty to conduct fair and reasonable settlement negotiations that made Dr. S. responsible for paying a verdict far in excess of the available $1 million in MCARE coverage. Mother thereafter sought summary judgment. The Commonwealth Court issued an unpublished memorandum and order dated December 8, 2008, denying Mother summary judgment. *Kinney–Lindstrom v. MCARE* Fund, (Pa.Cmwlth., No. 18 M.D.2007, filed December 8, 2008) ("*Kinney–Lindstrom I* "). First, relying on *Donegal Mutual Insurance Company v. Baumhammers*, 595 Pa. 147, 938 A.2d 286 (2007), which is discussed at length *infra*, the Commonwealth Court held that the liability of Dr. S. in the underlying medical malpractice action in the federal district court arose from a single "occurrence," thus entitling Mother to payment by the MCARE Fund of a single limit of liability of $1 million.[5] It reasoned that even though two children had been injured, it was Dr. S.'s failure to diagnose and treat

4. Section 715(b) of the MCARE Act provides:

If a health care provider is found liable for a claim defended by the department in accordance with subsection (a) [referring to medical professional liability claims made more than four years after the breach of contract or tort occurred], the claim shall be paid by the fund. The limit of liability of the fund for a claim defended by the department under subsection (a) shall be $1,000,000 per occurrence. 40 P.S. § 1303.715(b).

5. As described below, this Court in *Donegal* interpreted "occurrence," as defined in a private contract of insurance, to be the "cause" of the damage, and not the "effects" of the damage or how many claims resulted therefrom.

Mother's infection that constituted the single cause of the injuries to the children and, thus, there was one occurrence.

Second, citing this Court's decisions in *Willet v. Pennsylvania Medical Catastrophe Loss Fund*, 549 Pa. 613, 702 A.2d 850 (1997), and *Walsh v. Medical Professional Liability Catastrophe Loss Fund*, 576 Pa. 72, 838 A.2d 692 (2003), the court held that the MCARE Fund could be liable for delay damages and postjudgment interest on the entire $13.15 million judgment if it exercised exclusive control over settlement negotiations and was negligent in failing to exercise its authority to settle. *Kinney–Lindstrom I*, Slip Op. dated December 8, 2008, at 6. However, because the court had some doubt as to whether the MCARE Fund, in fact, had exclusive control over the settlement negotiations and whether it acted unreasonably in refusing to make an offer of settlement, it denied Mother summary judgment, permitting the litigation to continue to resolution of the factual dispute.

Subsequently, the MCARE Fund sought summary judgment on the same two issues. On March 23, 2009, the Commonwealth Court granted the MCARE Fund summary judgment on the "occurrences" issue, but denied summary judgment on the delay damages/post-judgment interest issue. *Kinney–Lindstrom v. MCARE Fund*, 970 A.2d 1206 (Pa. Cmwlth.Ct.2009) ("*Kinney–Lindstrom II* "). First, the court relied on its ruling in *Kinney–Lindstrom I*, and concluded that the failure of Dr. S. to determine promptly whether a chorioamniositis infection was present in the uterus of Mother constituted the single cause of the damages and, thus, there was a single occurrence in this case. Because the MCARE Fund already paid Mother $1 million for the single occurrence, the court concluded that the MCARE Fund was entitled to summary judgment on this claim.

Second, on the delay damages/postjudgment interest issue, the MCARE Fund argued that the *Willet/Walsh* standard, setting forth the circumstances where the Fund could be found liable for delay damages on a verdict that exceeded its statutory coverage limit, was no longer good law. It contend-

ed that Section 714(h) of the MCARE Act,[6] which directed it to pay delay damages and post-judgment interest "applicable to the fund's liability on a medical professional liability claim," 40 P.S. § 1303.714(h), superseded the *Willet/Walsh* standard. According to the MCARE Fund, the Legislature's enactment of Section 714(h) effectively limited its liability to delay damages and post-judgment interest based solely on the MCARE Fund's statutory coverage limit. Because the MCARE Fund had already paid delay damages and postjudgment interest on its $1 million coverage limit on the extended claim, the MCARE Fund argued that its proportionate share had been paid, thereby entitling it to summary judgment on this issue.

As set forth in detail *infra,* the Commonwealth Court denied the MCARE Fund summary judgment on the delay damages/post-judgment interest issue, rejecting the MCARE Fund's interpretation of Section 714(h) as superseding the standard set forth by this Court in *Willet* and *Walsh.* It held that Section 714(h) did not preclude Mother, standing in the shoes of Dr. S., from seeking common law indemnity from the MCARE Fund for delay damages and post-judgment interest on the entire verdict, which exceeded the $1 million statutory cap.

Mother thereafter requested and was granted a bench trial on the delay damages/post-judgment interest issue, which was conducted on January 25, January 26, and February 4, 2011. As described *infra,* conflicting evidence was offered as to the precise nature of the settlement negotiation. In an unpublished memorandum, the Commonwealth Court denied Mother's petition for review, holding that she was not entitled to delay damages and post-judgment interest on the entire

---

**6.** Section 714(h), entitled "Delay damages and post[-]judgment interest," states:

Delay damages and post[-]judgment interest applicable to the fund's liability on a medical professional liability claim shall be paid by the fund and shall not be charged against the participating health care provider's annual aggregate limits. The basic coverage insurer or self-insured participating health care provider shall be responsible for its proportionate share of delay damages and post[-]judgment interest.

40 P.S. § 1303.714(h).

$13.15 million verdict. *Kinney–Lindstrom v. MCARE Fund,* (Pa.Cmwlth., No. 18 M.D.2007, filed March 31, 2011) (*"Kinney–Lindstrom III "*). The court reiterated the *Walsh–Willet* standard, and held that indemnity is a common law equitable remedy that would shift to the MCARE Fund the liability of Dr. S. for delay damages and post-judgment interest if: (1) the MCARE Fund had exclusive control over the settlement of Mother's underlying medical malpractice case against Dr. S.; (2) the MCARE Fund was negligent in failing to exercise its authority to settle Mother's case against Dr. S.; and (3) the MCARE Fund's negligence caused the case not to settle. While the court held that the first requirement was satisfied because the MCARE Fund exercised exclusive control over the making of a settlement offer, it concluded that the remaining requirements were not satisfied because the evidence, as detailed *infra,* demonstrated that the MCARE Fund reasonably declined to make an offer of settlement.

A copy of the Commonwealth Court's final order of March 31, 2011 was sent to Mother on that day. On April 14, 2011, she sought leave to file *nunc pro tunc* post-trial motions on both the occurrence issue and the delay damages/post-judgment interest issue. Notwithstanding that the MCARE Fund had no objection to Mother's filing of late post-trial motions, the Commonwealth Court denied *nunc pro tunc* relief, holding that because a bench trial had occurred, post-trial motions were due within ten days after the March 31, 2011 order, and were not filed until April 14, 2011. *Kinney–Lindstrom v. MCARE Fund,* (Pa.Cmwlth., No. 18 M.D.2007, filed May 6, 2011) (*"Kinney–Lindstrom IV "*) (citing Pa.R.C.P. No. 227.1(c)(2) (providing that "[p]ost-trial motions shall be filed within ten days after ... the filing of the decision in the case of a trial without a jury")).[7] The court further held that

---

7. The fact-finding proceeding which the Commonwealth Court viewed as a bench trial concerned only the delay damages/postjudgment interest claim. The separate occurrence issue had already been adjudicated two years earlier on March 23, 2009, when the Commonwealth Court granted summary judgment in favor of the MCARE Fund. The Commonwealth Court did not suggest that Mother was required to file posttrial motions from the order granting summary judgment on the occurrence issue. *See* Pa.R.C.P. 227.1, note (explaining that post-trial

Mother's purported receipt of the order four days after it was mailed did not constitute sufficient cause for granting *nunc pro tunc* relief.

## Part I

### Failure to File Post–Trial Motions

■ Preliminarily, Mother challenges the Commonwealth Court's denial of her motion for leave to file post-trial motions *nunc pro tunc*. She disputes the lower court's conclusion that a trial occurred, which necessitated the filing of post-trial motions pursuant to Pa.R.C.P. 227.1(c)(2), and categorizes the proceeding below as merely an evidentiary hearing to adjudicate an original jurisdiction petition for review filed in the Commonwealth Court. *See* Pa.R.A.P. 1542 (providing that in matters addressed to the appellate court's original jurisdiction, where there are genuine issues of material fact, the court may, on its own or upon request of the parties, hold an evidentiary hearing for the development of the record). Even assuming that post-trial motions were required, Mother submits, the Commonwealth Court abused its discretion by denying her *nunc pro tunc* relief, considering that the MCARE Fund did not oppose her motion, and the late filing resulted from a good faith misunderstanding created by ambiguity in the applicable rules of civil and appellate procedure.

Significantly, as in the Commonwealth Court, the MCARE Fund does not take a position on these issues. Thus, we lack advocacy on whether the filing of post-trial motions was a prerequisite to appellate review of the issues raised herein, and whether the lower court abused its discretion by denying *nunc pro tunc* relief absent opposition by the MCARE Fund. In the absence of MCARE's objection or claim of prejudice, we decline to dismiss Mother's appeal, which raises novel issues addressed by the Commonwealth Court in a published decision. We further note that, under the circumstances presented, Mother's purported failure to file timely post-trial motions does not hamper our appellate review. Accordingly,

motions may not be filed to, *inter alia,* an order disposing of a motion for summary judgment).

we refrain from entertaining the merits of Mother's challenge to the Commonwealth Court's denial of her motion for leave to file post-trial motions *nunc pro tunc,* and proceed to address the remaining issues raised in Mother's appeal as though they were properly preserved.

## Part II

### Occurrence Issue

Before we entertain Mother's first contention, we recognize that the Commonwealth Court resolved the occurrence issue by granting summary judgment in favor of the MCARE Fund. Thus, we must keep in mind that a motion for summary judgment will only be granted if there is no genuine issue concerning any material fact, and the moving party is entitled to judgment as a matter of law. *See* Pa.R.C.P. 1035.2; *Wilson v. El–Daief,* 600 Pa. 161, 964 A.2d 354, 359 (2009). Because the question of whether a genuine issue of material fact exists is one of law, appellate review is *de novo. See Buffalo Twp. v. Jones,* 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002). In conducting such review, the record is viewed in the light most favorable to the non-moving party, and all doubts as to whether a genuine issue exists are resolved against the moving party. *See Basile v. H & R Block,* 563 Pa. 359, 761 A.2d 1115, 1118 (2000).

We must further keep in mind that, in her appeal, Mother is asserting Dr. S.'s claims against the MCARE Fund by virtue of assignment. Mother's first contention is that the Commonwealth Court erred by finding that Dr. S.'s negligence constituted a single "occurrence" under Section 715(b) of the MCARE Act, based on this Court's prior decision in *Donegal.* She challenges this conclusion on two separate grounds. First, Mother contends that the interpretation of "occurrence" enunciated by this Court in *Donegal* is inapplicable because *Donegal* defined that term for purposes of construing a homeowner's insurance policy, and not as set forth in the MCARE Act. Second, Mother maintains that even if we conclude that the *Donegal* interpretation of "occurrence" should apply equally to cases construing the MCARE Act, she has satisfied that

standard by demonstrating two causes of her children's injuries, *i.e.*, Dr. S's. failure to diagnose two separate infections that arose in each child at different times prior to birth, which resulted in severe permanent injuries to her children.[8]

We begin by examining the applicability of our decision in *Donegal.* In that case, a man went on a shooting spree, killing five people and injuring another. The surviving victim and the estates of the deceased victims filed complaints against the parents of the shooter, contending that they failed to obtain adequate mental health treatment for their son, failed to confiscate his firearm, and failed to notify the appropriate authorities that their son was unstable and possessed a firearm. Thus, the insureds/parents were not the direct cause of the harm inflicted upon the multiple victims, but were alleged to have been negligent in failing to prevent their son from committing these atrocities.

On appeal, we examined whether, under the parents' homeowner's insurance policy, the injuries to the six individual victims constituted six separate "occurrences" or one single "occurrence" for purposes of ascertaining the limits of the parents'/insureds' liability coverage. Notably, the policy at issue in *Donegal* defined "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in ... [b]odily injury or [p]roperty damage." *Id.* at 289.

In determining the meaning of "occurrence" as so defined, this Court in *Donegal* considered two competing approaches: (1) the "cause" approach, adopted by most jurisdictions, which focuses on the act of the insured that gave rise to liability and determines the number of occurrences by examining whether there is a single cause or multiple causes of the damages; and (2) the "effects" approach, which looks to the effect of the

8. As explained in detail *infra,* we find that there is a genuine issue of material fact as to whether the children's injuries arose from Dr. S's failure to diagnose and treat a single infection or multiple discrete infections. In entertaining the arguments of the parties, language in this opinion should not be viewed as opining on the factual determination to be adjudicated by the jury.

insured's acts and determines the number of occurrences by examining the number of individual claims or injuries that resulted from the accident. *Id.* at 293.

We adopted the "cause" approach, and reasoned that "[d]etermining the number of occurrences by looking to the underlying negligence of the insured [as opposed to the number of claims or injuries resulting therefrom] recognizes that the question of the extent of coverage rests upon the contractual obligation of the insurer to the insured." *Id.* at 296. As the policy at issue in *Donegal* was intended to insure the parents of the shooter for their liabilities, we held that an occurrence should be defined to encompass an event over which the parents/insureds had some control. *Id.* We concluded that because the liability of the shooter's parents was premised upon their inaction, *i.e.,* their failure to confiscate their son's weapon and/or notify authorities of his unstable condition, the resulting injuries stemmed from one cause and constituted one occurrence; the fact that there were multiple victims could not be used as a basis to determine the limits of the parents' liability coverage. *Id.*

Without analysis, the Commonwealth Court in the instant case imported our interpretation of "occurrence" as set forth in the policy in *Donegal* to the language of Section 715 of the MCARE Act, and held there was a single occurrence because Dr. S's failure to diagnose and treat Mother's infection constituted the single cause of the injuries to her children.

As noted, Mother contends that the Commonwealth Court erred because our interpretation of "occurrence" in *Donegal* should be limited to the meaning of that term as defined in the private contract of insurance at issue there, and has no applicability to the same term as employed in Section 715 of the MCARE Act. Mother asserts there are vast differences between the limited purposes of an insurance policy, which she describes as protecting the assets of the insured by transferring the risk of loss to the third-party insurer, and the purported broad remedial purpose of the MCARE Act, which she views as ensuring that victims of medical malpractice receive swift resolution of their claims and fair compensation

for their injuries. *See* 40 P.S. § 1303.102(4) (declaring one of the policies of the MCARE Act as ensuring that victims of medical malpractice receive a prompt determination and fair compensation).

Mother posits that the MCARE Act's "remedial goal" of securing fair compensation for medical malpractice victims would not be served by an approach that focuses solely on the conduct of the medical professional, and requires all victims of the medical malpractice to share the same limited fund, regardless of the number of victims. Rather, she concludes, the better interpretation of the term "occurrence" as applied to an extended claim under the MCARE Act, would be an approach, similar to the "effects" approach rejected in *Donegal*, which looks to the number of claims or injuries that resulted from the negligence of the insured.[9] Because Dr. S.'s alleged malpractice resulted in injuries to two children, Mother submits there were two occurrences, requiring the MCARE Fund to tender two payments of $1 million under Section 715.

Alternatively, Mother contends that even assuming the "cause" approach as adopted in *Donegal* applies, she has demonstrated multiple causes of the damages because it is undisputed that her twins were subjected to different infectious organisms at different times, which Dr. S. discretely failed to diagnose and treat. Mother clarifies that her federal medical malpractice action against Dr. S. was not based on his failure to treat her infection properly, but rather on the breach of his distinct duties to each twin to protect them from being trapped in a toxic intrauterine environment. She emphasizes that she commenced separate claims on behalf of each child, and that the jury made separate determinations of liability as well as separate awards of damages for each child. Mother concludes that the MCARE Fund remains liable for two occurrences under Section 715.

9. Mother concedes, without elaboration, that her proposed interpretation of "occurrence" would apply only to extended claims under Section 715 of the MCARE Act, and not to excess claims filed under Section 712. *See* Reply Brief for Appellant/Response Brief for Appellee, at 6.

In response, the MCARE Fund appears to recognize that *Donegal* is not, on its face, dispositive of the instant appeal because it did not involve interpretation of Section 715 of the MCARE Act. Nevertheless, it argues that this Court's ruling in *Donegal*, that the number of occurrences is determined by the number of proximate causes of the injuries, applies with equal force to the MCARE Fund's statutory liability limit because the MCARE Act exists in the context of and as a support to private insurance programs for health care providers. To give the specialized term "occurrence" in the MCARE Act a different construction than that applied to a private insurer, it argues, would be unworkable and unreasonable.

In support thereof, the MCARE Fund relies primarily upon the plain language of Section 715(b), which limits its liability for an extended claim to $1 million "per occurrence," and does not speak in terms of $1 million "per claim" or "per claimant" (*see* n.4, *supra*) as Mother suggests. Because the MCARE Act employs the terms "claim" and "occurrence" in such a way as to necessitate different meanings, the MCARE Fund argues that the policies underlying the statutory scheme are in no way compromised by adoption of the "cause" approach to determining the number of occurrences.

Further, unlike a workers' compensation statute, which is unquestionably remedial in nature and intended to benefit the injured worker,[10] the MCARE Fund submits that the MCARE Act was not adopted to afford victims of medical malpractice greater awards. To the contrary, it submits, the MCARE Act was adopted to protect health care providers from escalating medical malpractice insurance premiums, with the goal of retaining qualified health care providers within the Commonwealth. Absent any exclusive remedial purpose of the statutory scheme, and because the MCARE Fund is acting similar to

10. Because the Workers' Compensation Act, 77 Pa. Stat. Ann. § 1 *et seq.*, is remedial in nature and intended to benefit the worker, it must be liberally construed to effectuate its humanitarian objectives, and borderline interpretations of the Act are to be construed in the worker's favor. *Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Givner)*, 614 Pa.606, 39 A.3d 287, 290 (2012).

a primary insurer in an extended claim setting, the Fund concludes there is no reason to define "occurrence," as employed in the MCARE Act, any differently than this Court defined the term in *Donegal.*

Moreover, the MCARE Fund emphasizes Mother's concession that her proposed interpretation of "occurrence," focusing on the number of victims of the malpractice, would apply only to extended claims under Section 715 of the Act, and not excess claims under Section 712, which also employs the term "occurrence." *See* Reply Brief for Appellant/Response Brief for Cross–Appellee at 6 (providing that "where the MCARE Fund only provided excess coverage because primary coverage was available through a private insurer, then the ordinary, more restrictive insurance law definition of 'occurrence' would apply"). Defining "occurrence" differently in two provisions of the same statute, the MCARE Fund argues, is absurd and results in an incoherent statutory scheme that was not intended by the Legislature.

The MCARE Fund notes that this construction would also result in different liability attaching depending on the random factor of when the claim is raised. For example, had Mother raised the claim within four years of the malpractice, Dr. S.'s private primary insurer would have been liable for one occurrence under *Donegal;* but, in Mother's view, because the claim was raised more than four years after the tort occurred, the MCARE Fund, acting as both the primary and excess insurer under Section 715, would be liable for two occurrences. The MCARE Fund contends that such result is untenable and demonstrates the perils of adopting Mother's position. Employing the cause approach, the MCARE Fund concludes that the single cause of all the injuries alleged in Mother's underlying medical malpractice action was the professional negligence of Dr. S. in failing to diagnose and treat her intrauterine infection, which adversely affected her twins.

Finally, the MCARE Fund responds to Mother's alternative contention that she has satisfied the "cause" approach definition of "occurrence" because different infectious organisms attacked her twins at different times, and that Dr. S. failed to

diagnose and treat each condition. The MCARE Fund refutes Mother's averments that it is undisputed that the twins were infected by separate organisms at separate times. Rather, it asserts that the identity of the organism or organisms infecting the twins and the sequence in which the twins were infected were not issues of material fact that were presented to the jury in the underlying medical malpractice action. The MCARE Fund further contends there is no support in logic or case law establishing that Dr. S. owed separate duties of care to each fetus. Thus, it concludes that Mother's alternative claim should be rejected, and the Commonwealth Court's holding that Dr. S.'s negligence constituted one occurrence, entitling Mother to a single payment of $1 million, should be affirmed.

■ We begin by recognizing that our decision in *Donegal* is not dispositive as that case interpreted the term "occurrence" in a private contract of insurance and not as employed in the MCARE Act. To determine whether "occurrence" has the same meaning under Section 715 of the MCARE Act, we must examine the relevant statutory language to ascertain and effectuate the General Assembly's intent. As a general rule, the plain language of a statute is the best indicator of legislative intent. *Mercury Trucking, Inc. v. Pa. PUC*, 618 Pa. 175, 55 A.3d 1056, 1067–68 (2013); 1 Pa.C.S. § 1921(a). This general rule is subject to several important qualifications, including that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable, *id.*; 1 1 Pa.C.S. § 1922(1), (2), and that the General Assembly "intends to favor the public interest as against any private interest." *Id.* § 1922(5).

■ If the words of a statute are ambiguous, we resort to considerations other than the plain language to discern legislative intent. *Commonwealth v. Garzone*, 613 Pa. 481, 34 A.3d 67, 75 (2012) (citing 1 Pa.C.S. § 1922). Among the matters we may consider are: the occasion and necessity for the statute; the circumstances under which the statute was enacted; the mischief to be remedied; the object to be attained; the

consequences of a particular interpretation; the contemporaneous legislative history; and the legislative and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c).

Keeping these precepts in mind, we turn to Section 715(b), which states:

> If a health care provider is found liable for a claim defended by the department in accordance with subsection (a) [referring to medical professional liability claims made more than four years after the breach of contract or tort occurred], the claim shall be paid by the fund. The limit of liability of the fund for a claim defended by the department under subsection (a) shall be $1,000,000 per occurrence.

40 P.S. § 1303.715(b).

The General Assembly did not define the key term "occurrence," and, as demonstrated by our discussion in *Donegal*, this term is subject to multiple interpretations. Thus, we find that the statutory language in Section 715(b) is ambiguous, and we are required to employ the aforementioned canons of statutory construction. While the precise meaning for "occurrence" may be unclear, the context in which the term is used in Section 715(b) is instructive. Section 715(b) expressly limits liability on an extended "claim" to $1 million "per occurrence." Thus, it is clear that the Legislature intended the term "occurrence" to mean something distinct from a "claim," thereby discounting Mother's position that "occurrence" indicates the number of victims or claims arising from a health care provider's single act of professional negligence. Had the Legislature intended Mother's interpretation, it could have expressly limited liability on an extended claim to $1 million "per claim" or "per victim of professional negligence." It did not do so. Accordingly, the statutory language does not support Mother's position that the General Assembly intended for occurrences to be determined pursuant to the "per claim" or "effects" approach, rejected by this Court in *Donegal*, which would focus on the number of victims of the medical malpractice, rather than concentrating on the act of negligence committed by the health care provider that caused the harm alleged.

We further respectfully reject Mother's reliance on a purported exclusive remedial goal of the MCARE Act, which she argues would warrant a liberal interpretation of the statute in favor of the victim of professional negligence. This Court has recognized that the "Legislature enacted the MCARE Act in response to perceived spiraling costs of medical malpractice claims, the resultant rise in health care providers' malpractice insurance premiums, and the alleged fear that qualified health care providers would choose not to practice medicine in the Commonwealth if the trend of escalating costs continued." *Pa. Med. Soc'y v. Dep't of Pub. Welfare,* 614 Pa. 574, 39 A.3d 267, 271 (2012). While a prompt determination of medical malpractice claims and fair compensation to the injured victim of malpractice are vital to the statutory scheme, 40 P.S. § 1303.101(4), we cannot ignore the concomitant goal of enabling health care providers to obtain professional liability insurance at an affordable cost. *Id.,* § 1303.101(3). Considering these competing interests, we decline to construe Section 715 of the MCARE Act liberally in favor of the victim of medical malpractice.

■ Upon examination of the text of Section 715, and absent an exclusive remedial goal of favoring the interests of the alleged victims of professional negligence over the interests of health care providers, we agree with the MCARE Fund that there is no reason for "occurrence" to be construed in the MCARE Act in a manner markedly different from the way the term was interpreted in *Donegal.* The MCARE Fund exists in the context of and as a support to private insurance programs for health care providers, and, in an extended claim scenario, effectively acts as the primary insurer. Thus, consistency in the interpretation of a specialized term in both the private insurance industry and pursuant to the MCARE Act is warranted. Accordingly, we hold that the number of occurrences under Section 715 is determined by examining whether there is one or multiple instances of professional negligence that caused the harm alleged; the number of victims of the medical malpractice is not controlling

when considering the MCARE Fund's liability limit.[11] Additionally, each instance of negligence must be associated with a distinct injury.

 Applying that construct to the facts presented, we are unable to determine at this stage of the proceedings whether Dr. S. committed a single or multiple instances of professional negligence that caused the harm suffered by Mother's children because disputed issues of fact remain. As noted, in her petition for review, Mother asserted that each of her fraternal twins became infected by different organisms at different times, and that Dr. S. was negligent in failing to diagnose and treat each separate condition. Adoption of this view would tend to suggest that there may be two separate instances of professional negligence causing distinct damages to each twin, and, thus, two occurrences.

To the contrary, the MCARE Fund maintains that Dr. S. committed one act of professional negligence, *i.e.*, the failure to diagnose mother's infection, which was the sole cause of the harm suffered by her twins. It submits that the identity of the organisms infecting the twins and the sequence in which the twins were infected were not factual issues presented to the jury in the underlying federal medical malpractice action, and, thus, cannot support a finding of two instances of professional negligence in this petition for review.

These competing views reveal a disputed issue of fact to be adjudicated by a jury, and not decided as a matter of law. Contrary to the MCARE Fund's assertion, the lack of factual findings adjudicated at Mother's federal medical malpractice trial, regarding the identity of the organisms infecting the twins and the sequence in which the twins were infected, does not prevent Mother from asserting herein that Dr. S. committed two instances of malpractice by failing to diagnose and treat two distinct infections that harmed each of her twins. The medical malpractice action was commenced by Mother

11. We also agree with the MCARE Fund that there is no support for Mother's assertion that the Legislature intended for "occurrence" to have different meanings when discussing extended claims under Section 715 and excess claims under Section 712.

against Dr. S., while the instant action involves Dr. S.'s claim against the MCARE Fund for failing to provide sufficient coverage, which Dr. S. assigned to Mother. Thus, the two actions involve different parties and different issues, and the factual findings, or lack thereof, in the former proceeding do not control in the latter.

Moreover, the facts alleged by Mother in her petition for review are accepted as true for purposes of ruling on the MCARE Fund's motion for summary judgment. *See Basile v. H & R Block*, 761 A.2d at 1118 (holding that in reviewing the grant of summary judgment, the record is viewed in the light most favorable to the non-moving party, and all doubts as to whether a genuine issue exists are resolved against the moving party). Because there is a material issue of fact as to whether Dr. S. committed one or two instances of professional negligence that caused the harm suffered by Mother's children, the Commonwealth Court erred by granting summary judgment as a matter of law. Accordingly, we reverse the grant of summary judgment, and remand for trial to resolve this factual discrepancy.

## Part III

### Delay Damages and Post–Judgment Interest

■ The next two claims, presented in Mother's appeal and the MCARE Fund's cross-appeal, involve the MCARE Fund's liability for delay damages and postjudgment interest.[12] In

12. In her reply brief, Mother requests that we dismiss the MCARE Fund's cross-appeal for lack of standing, asserting that the Fund is not aggrieved because the Commonwealth Court entered judgment in its favor. *See* Pa.R.A.P. 501 (providing that any aggrieved party may appeal). In response, the MCARE Fund acknowledges that it prevailed below, but contends that it is aggrieved by the Commonwealth Court's published holding that it could face liability for delay damages and postjudgment interest based on an amount in excess of its statutory coverage limit. We decline to dismiss the MCARE Fund's cross-appeal for lack of standing as we view the issue presented therein as merely an alternative response to the same issue raised by Mother, and not as a new issue. To clarify, the issue presented in Mother's appeal is whether the MCARE Fund is liable for delay damages and postjudgment interest on the jury's verdict of $13.15 million. The issue raised in the MCARE Fund's cross-appeal merely responds to Mother's contention,

her assigned claim, Mother contends that under this Court's decisions in *Willet* and *Walsh,* the MCARE Fund is liable to Dr. S. under the common law theory of indemnification for delay damages and postjudgment interest based on the entire $13.15 million jury verdict because it was the MCARE Fund's negligence in failing to settle the case that rendered Dr. S. liable for a jury verdict of $13.15 million, far exceeding the MCARE Fund's statutory maximum coverage of $1 million. The MCARE Fund, however, posits that our decisions in *Willet* and *Walsh* have been superseded by Section 714(h) of the MCARE Act, and that it can only be liable for delay damages and postjudgment interest based on its statutory coverage limit of $1 million, which it has already paid. It further contends that if we conclude that the standard set forth in *Willet* and *Walsh* remains good law, the Commonwealth Court correctly held that Mother did not satisfy it here.

We shall first examine the cases upon which Mother relies, determine whether they remain valid in light of the General Assembly's enactment of Section 714(h), and, if so, proceed to apply them to the facts presented. In *Willet,* a victim of medical malpractice filed a civil action seeking damages against a physician and a hospital ("appellants"). Both appellants acknowledged that the malpractice claim was meritorious and sought to resolve the matter prior to trial. The appellants' basic liability insurers tendered their limits of basic coverage toward settlement, but the predecessor to the MCARE Fund, the Pennsylvania Medical Catastrophe Loss Fund ("CAT Fund"), did not tender the statutory limits of its excess coverage, and the plaintiff's pretrial settlement offer was rejected. The case proceeded to a jury, which rendered a $4 million verdict. The trial court thereafter imposed delay damages and postjudgment interest against appellants.

Appellants subsequently filed a complaint against the CAT Fund, seeking indemnification for a portion of delay damages

and asserts that, pursuant to Section 714(h) of the MCARE Act, it can never be liable for delay damages and postjudgment interest on an amount exceeding its statutory $1 million coverage limit.

added to the $4 million jury verdict. Specifically, the appellants sought recovery of those delay damages attributable to the period of time during which the CAT Fund was in control of the settlement negotiations, but withheld coverage. They maintained that if the CAT Fund had offered coverage during that time, the plaintiff's pre-trial settlement offer would have been accepted, and delay damages would not have been imposed against the appellants. The Commonwealth Court rejected these contentions and sustained the CAT Fund's demurrer, holding there was no legal basis for either indemnification or contribution from the Fund.

On appeal to this Court, the appellants argued that the law of indemnity provides an equitable remedy to shift the delay damages from them to the party who occasioned the loss, the CAT Fund. They further contended that Pa.R.C.P. 238 served as a legal basis upon which to impose vicarious liability for the delay damages accruing while the CAT Fund was in control of the negotiations.[13] This Court agreed. We recognized that "[i]ndemnity is a common law remedy which shifts the entire loss from one who has been compelled, by reason of some legal obligation, to pay a judgment occasioned by the initial negligence of another who should bear it." 702 A.2d at 854 (citing *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368, 370 (1951)). We held that the circumstances, as pled by the appellants in their complaint, supported the inference that the CAT Fund, during the period it controlled the settlement negotiations, negligently limited its offers of settlement to minimize its payments, thereby causing the settlement negotiations to fail and subjecting appellants to the imposition of delay damages. Thus, we concluded that appellants' complaint effectively plead a cause of action for indemnification of delay damages based on a jury verdict that exceeded the CAT Fund's $1 million statutory coverage limit, and that such complaint should have survived preliminary objections.

13. Pennsylvania Rule of Civil Procedure 238 provides that upon the request of a plaintiff in a civil action seeking monetary relief for bodily injury or death, damages for delay shall be added to the amount of compensatory damages awarded against the defendant by the jury verdict. Pa.R.C.P. 238(a)(1).

This Court in *Walsh* reiterated that the CAT Fund could be liable to an insured on an indemnification claim for delay damages that exceeded the amount of its statutory coverage where the CAT Fund exercised exclusive control over the settlement negotiations and its negligent refusal to tender its policy limit caused the case not to settle. Unlike *Willet,* however, the Court in *Walsh* found that the CAT Fund did not have exclusive control over the settlement negotiations at the time the plaintiff's pretrial settlement offer was denied. Both the physician's primary insurer and the CAT Fund in *Walsh* had failed to offer coverage limits in settlement, thus; the primary insurance had not been exhausted, and the CAT Fund's obligation to contribute the next dollar amount in excess coverage was never triggered. Nonetheless, the physician argued that the CAT Fund retained exclusive control over the settlement negotiations because it urged the primary insurer not to tender its coverage limit in settlement. We held that the CAT Fund's act of dissuading the primary insurer from tendering policy limits did not establish that the CAT Fund had exclusive control over the settlement negotiations as the primary insurer had no obligation to follow the CAT Fund's direction. Accordingly, there was no basis to support an indemnification claim against the CAT Fund.

## Part III(A)

## Applicability of Section 714(h)

As noted, the MCARE Fund argues that the general rule set forth in *Willet* and *Walsh* has been superseded by Section 714(h), which provides as follows:

**Section 1303.714. Medical professional liability claims**

\* \* \*

**(h) Delay damages and postjudgment interest.**—Delay damages and postjudgment interest applicable to the fund's liability on a medical professional liability claim shall be paid by the fund and shall not be charged against the participating health care provider's annual aggregate limits. The basic coverage insurer or self-insured participating health

care provider shall be responsible for its proportionate share of delay damages and post[-]judgment interest.

40 P.S. § 1303.714(h).

Notwithstanding that Section 714(h) does not refer to "indemnification claims" and appears under Section 714, entitled "Medical professional liability claims," the MCARE Fund argues that the Legislature's use of the phrase "applicable to the fund's liability" in the first sentence of Section 714(h) was intended to override this Court's endorsement of a health care provider's common law claim for indemnification of delay damages based on a jury verdict award exceeding $1 million. Reading the two sentences of Section 714(h) together, the MCARE Fund contends that it can only be liable for its "proportionate share" of delay damages and postjudgment interest, which, it argues, cannot exceed the Fund's $1 million statutory coverage limit, regardless of the amount of the jury verdict. It relies on this Court's mere acknowledgment in both *Willet* and *Walsh* that its decision did not involve consideration of the 1996 Legislative amendments, which added the "proportionate share language" that now appears in Section 714(h).[14] *See Willet,* 702 A.2d at 856 n. 10; *Walsh,* 838 A.2d at 695 n. 8.

The Commonwealth Court rejected the MCARE Fund's interpretation of Section 714(h) as a matter of law, and denied the MCARE Fund summary judgment on this issue. *Kinney–Lindstrom II,* 970 A.2d at 1208–09. It recognized a distinction between the MCARE Fund's obligation to pay delay damages and postjudgment interest to a defendant/health care provider on a common law indemnification claim, and the MCARE Fund's obligation to pay delay damages and postjudgment interest to a plaintiff on behalf of a health care provider based on a claim of medical professional liability. *See Lahav v. Main Line Ob/Gyn Associates,* 556 Pa. 245, 727 A.2d 1104, 1107 (1999) (holding that while a plaintiff's

14. While not identical, both Section 714(h), enacted in 2002, and its predecessor, enacted in 1996, refer to the payment of delay damages and postjudgment interest "applicable to the fund's liability...." *See* 40 P.S. § 1303.714(h); 40 P.S. § 1301.702(j) (repealed), respectively.

delay damages could not be assessed directly against the CAT Fund because the CAT Fund was not the defendant in the underlying medical malpractice action, the CAT Fund may be liable to the plaintiff for delay damages that are part of an award against a health care provider as a consequence of a claim for professional liability; but only to the extent that those damages do not exceed the $1 million statutory cap).

The Commonwealth Court held that Section 714(h) governs only the MCARE Fund's liability to a plaintiff who has prevailed on a medical professional liability claim against a health care provider, and has no relevance to the MCARE Fund's indemnity liability to a defendant/health care provider who, because of the MCARE Fund's negligence, paid delay damages and post judgment interest to a plaintiff on a medical malpractice claim. The Commonwealth Court concluded that Section 714(h) allocates the liability for delay damages and postjudgment interest between the health care provider's basic coverage insurer and the MCARE Fund, which generally acts as the excess insurer in the typical case. Because the instant case involves an extended claim filed more than four years after the alleged tort occurred, *see* n.4, *supra*, for which the MCARE Fund provides both basic and excess coverage, the court held there is no need to allocate liability for delay damages and postjudgment interest between the primary and excess insurer pursuant to Section 714(h), as both are the MCARE Fund's responsibility. Accordingly, the Commonwealth Court held that Section 714(h) in no way superseded this Court's decisions in *Willet* and *Walsh* and did not prevent Mother, standing in the shoes of defendant/Dr. S. by virtue of an assignment, from seeking indemnification under common law for delay damages and postjudgment interest on the entire $13.15 million verdict.

Mother supports the Commonwealth Court's interpretation of Section 714(h). She advocates that such provision has no applicability to indemnification claims filed against the MCARE Fund, and, thus, the *Willet/Walsh* standard remains applicable to the facts presented. Mother emphasizes there is nothing in the text or legislative history of Section 714(h)

supporting the MCARE Fund's assertion that Section 714(h) was intended to supersede governing precedent of this Court regarding the MCARE Fund's liability to a health care professional on an indemnity theory. She concludes that if the Legislature intended to change the existing case law on indemnification of delay damages and postjudgment interest, it would have used language that clearly conveyed such intention. According to Mother, it did not do so in Section 714(h).

 Examining the statutory language of Section 714(h), we agree with Mother that the Commonwealth Court's interpretation is sound. As that court cogently noted, Section 714(h) allocates the payment of delay damages and postjudgment interest on a plaintiff's medical professional liability claim between the health care provider's basic coverage carrier and the MCARE Fund, and directs that the MCARE Fund's liability in this regard shall not be charged against the health care provider's annual aggregate limits. *See Caruso v. Medical Professional Liability Catastrophe Fund,* 858 A.2d 620, 625 (Pa.Super.2004) (holding that Section 714(h) and its predecessor, Section 702(j), require the basic coverage insurer to shoulder its proportionate share of the liability for delay damages and postjudgment interest on a plaintiff's medical professional liability claim).

Significantly, and contrary to the MCARE Fund's contention, Section 714(h) does not speak to the viability of a health care provider's common law indemnity action against the MCARE Fund or alter governing case law of this Court on that point. Accordingly, we hold that Section 714(h) did not supersede our decisions in *Willet* and *Walsh,* and proceed to examine whether the Commonwealth Court erred in applying those cases to the facts presented.

### Part III(B)

### Application of *Willet/Walsh* Standard

 Mother contends the Commonwealth Court erred by denying relief on her assigned claim of indemnification because she demonstrated that the MCARE Fund: (1) had

exclusive control over the settlement negotiations of the medical malpractice action; (2) was negligent in failing to offer coverage limits in settlement; and (3) that such negligence caused the case not to settle, subjecting Dr. S. to a $13.15 million verdict. Thus, she maintains, the standard set forth in *Willet* and *Walsh*, requiring exclusive control, negligence, and causation, is satisfied.

Following trial on the issue before the Commonwealth Court, at which conflicting evidence was presented regarding the parties' attempt at settlement, the court held that although the MCARE Fund exercised exclusive control over settlement negotiations, it was not negligent in failing to offer Dr. S.'s coverage limits to settle Mother's medical malpractice claim. We reiterate those factual findings relevant to the Commonwealth Court's holding in this regard. During negotiations, Dr. S. gave consent to the MCARE Fund to use the $1 million coverage limit to settle Mother's claim against all three defendants (Dr. S., another physician, and a hospital) only due to concern for his codefendant/physician, as Dr. S. did not fear an adverse verdict and believed he had done nothing wrong. The Commonwealth Court further found that the MCARE Fund "floated" an offer of $75,000 during a telephone conversation with Mother's counsel,[15] which was declined. Finally, the court found that throughout the negotiations, Mother had always demanded contribution in settlement from the hospital, which the hospital declined, and Mother never informed the MCARE Fund of her willingness to accept $1 million to settle the entire case.[16]

Based on these facts, the Commonwealth Court concluded that the MCARE Fund was not negligent in failing to make an

15. The Commonwealth Court rejected the testimony of the MCARE Fund's adjuster, suggesting that he had "floated" an offer of $1 million to settle the case against all three defendants.

16. Mother and her counsel testified at the indemnification trial that they would have accepted $1 million to settle the entire case after adverse testimony was presented during the underlying medical malpractice trial that harmed Mother's claim against Dr. S.'s codefendant/physician. The Commonwealth Court did not expressly reject this testimony, but found as a matter of fact that Mother never conveyed any willingness to settle to the MCARE Fund.

offer of settlement. First, it reasoned that, unlike *Willet*, where the defendant in the medical malpractice action recognized the merit of the underlying claim and sought to settle the matter and avoid trial, Dr. S. did not believe there was a significant case against him, and gave consent to the MCARE Fund to use his $1 million coverage only if the contribution of funds would settle the case against all three defendants. Thus, the Commonwealth Court reasoned, the MCARE Fund did not breach a duty to its insured/physician, Dr. S., by failing to offer a settlement that Dr. S. did not believe was warranted on his behalf. Second, the court held that the MCARE Fund's failure to make a formal settlement offer was not a breach of duty to Dr. S. because the MCARE Fund reasonably believed, based on Mother's representations, that she required $1 million from the MCARE Fund, plus additional funds from the hospital to settle the case.

The Commonwealth Court noted that every attorney for the defense in the malpractice action consistently testified at the indemnification trial that Mother required contribution from the hospital to settle, and that Mother never communicated a demand to settle all claims for $1 million. Thus, the court concluded that the MCARE Fund reasonably believed that a $1 million offer to settle all claims would have been futile.

Mother argues that the Commonwealth Court erred by relying on Dr. S.'s subjective belief that the medical malpractice claim lacked merit, finding such fact immaterial because there is no consent to settle provision under the MCARE Act. According to Mother, the MCARE Fund ignored the likelihood of an extremely large verdict for her two infants who were severely and permanently injured, and would require care for their lifetimes. She relies on the testimony of defense counsel for the hospital in the underlying medical malpractice action, acknowledging that Mother potentially had a 40% chance of prevailing, and that if she did prevail, a very large award of damages would follow. In Mother's calculation, unsupported by any authority, a 40% chance of obtaining a $13 million verdict renders the value of the case at $5.2 million, necessitating an offer of the $1 million statutory limit.

Mother further challenges the Commonwealth Court's reliance on her purported failure to make known that she would accept $1 million in settlement. She asserts that any demand for settlement appeared futile as the MCARE Fund adjuster indicated that he did not believe the case would expose Dr. S. to liability in excess of $100,000. In Mother's view, the MCARE Fund's valuation of a $13.15 million claim as being worth less than $100,000 establishes a breach of duty to conduct fair and reasonable settlement negotiations on behalf of Dr. S. She concludes that the MCARE Fund's failure to offer Dr. S.'s $1 million coverage limit to settle the underlying medical malpractice claim exposed him to liability on the excess verdict, thereby rendering the MCARE Fund liable to pay postjudgment interest and delay damages on the entire $13.15 million verdict pursuant to *Willet* and *Walsh.*

The MCARE Fund responds that the Commonwealth Court correctly ruled that it was not negligent in failing to offer Dr. S.'s $1 million maximum coverage during the settlement negotiations because all defense counsel in the medical malpractice action, as well as two claims committees it convened to study the case, advised that the case would more likely result in a defense verdict. Additionally, it reiterates the Commonwealth Court's holding that Mother never indicated that an offer of $1 million might be accepted, and, instead, consistently led the MCARE Fund to believe that she would not consider settlement without a contribution from the other two non-settling codefendants, the hospital and a second physician. The MCARE Fund concedes there was a potential for a large recovery, but argues that such fact, in and of itself, does not require it to offer the maximum statutory coverage or risk liability for delay damages and postjudgment interest on the entire verdict. In sum, the MCARE Fund concludes that it was reasonable not to offer a settlement that none of the defendants wanted, and that it believed the plaintiff would not accept.

We agree with the Commonwealth Court that the MCARE Fund did not act negligently during the settlement

negotiations.[17] There is no impropriety in the court's recognition that Dr. S., unlike the defendant/physician in *Willet*, believed that he did not commit professional negligence while treating Mother during her pregnancy. Although Dr. S.'s consent to settle the malpractice action may not have been statutorily required, the doctor's belief that the claim was not meritorious, which the defense experts purportedly corroborated, is surely relevant to a determination of whether the MCARE Fund acted negligently in failing to offer full coverage in settlement. Further, the mere fact that a large verdict would result if the jury credited the plaintiff's experts in the underlying medical malpractice case cannot alone render the MCARE Fund negligent in failing to settle.

Finally, we agree with the Commonwealth Court that the instant case is distinguishable from both *Willet* and *Walsh* because in those cases, the plaintiff made a settlement demand which could have been satisfied had the CAT Fund, as predecessor to the MCARE Fund, tendered full coverage limits. Here, not only did Mother not make any settlement demands, but the record supports the Commonwealth Court's finding that she consistently represented that she would not be amenable to a settlement without contribution from the hospital/defendant, which was not forthcoming. Under such circumstances, we agree with the MCARE Fund that it cannot be deemed negligent for failing to offer a settlement that none of the defendants wanted and that it reasonably believed the plaintiff would not accept. Accordingly, the Commonwealth Court correctly determined that Mother is not entitled to relief on her indemnification claim.

### Part IV

### Conclusion

For the reasons set forth herein, we hold that the number of occurrences under Section 715 is determined by examining

---

17. To demonstrate negligence, a plaintiff must establish that the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an actual loss or damages. *Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 980 A.2d 502, 506 (2009).

whether there is one or multiple instances of professional negligence that caused the harm alleged; the number of victims of the medical malpractice is not controlling when considering the MCARE Fund's liability limit. Because we find that there is a material issue of fact as to whether Dr. S. committed one or two instances of professional negligence that caused the harm suffered by Mother's children, we reverse the Commonwealth Court's grant of summary judgment in favor of the MCARE Fund, and remand for trial on that issue. We further affirm the Commonwealth Court's holding that Section 714(h) of the Act does not supersede this Court's holdings in *Willet* and *Walsh.* Finally, we affirm the Commonwealth Court's holding that Mother is not entitled to relief on her indemnification claim for delay damages and postjudgment interest because the MCARE Fund did not act negligently in failing to offer Dr. S.'s full coverage limits in settlement.

Former Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, and Justices SAYLOR, EAKIN, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion with only the following comments and reservations.

In terms of the cross-appeal issue, *see* Majority Opinion, at 74–77 & n.12, 73 A.3d at 557–58 & n.12, although I support the majority's approach, I have set down my own tentative thoughts concerning protective cross-appeals in *Basile v. H & R Block, Inc.,* 601 Pa. 392, 973 A.2d 417 (2009). *See id.* at 402–04, 973 A.2d at 423–25 (Saylor, J., concurring). Certainly, the practice remains in need of clarification, whether via rule or decision.

Respecting Part III(A) of the majority opinion, *see* Majority Opinion, at 75–80, 73 A.3d at 558–61—pertaining to the availability of delay damages based on common-law indemnity

theory—there would seem to me to be some potential ambiguities, which I would address as follows.

First, the majority indicates that Section 714(h) "allocates the payment of delay damages and postjudgment interest on a plaintiff's medical professional liability claim between the health care provider's basic coverage carrier and the MCARE Fund[.]" Majority Opinion, at 80, 73 A.3d at 560. I do not believe, however, that this language should be read as signifying that *all* delay damages and postjudgment interest are allocated between primary insurers and the MCARE Fund. In this regard, Section 714(h) addresses only such delay-damages/interest assessments as are allocable to primary insurers' and the Fund's respective liabilities. *See* 40 P.S. § 1303.714(h).

Second, I believe that it would be useful, conceptually, to respond further to the MCARE Fund's argument that the *Walsh* Court's footnoted allusion to the alteration worked by Section 714(h)'s predecessor signified that the availability of common-law indemnification against the CAT Fund (and, by extension of the reasoning, the MCARE Fund) was superseded. *See* Brief for Appellee/Cross–Appellant at 40 (citing *Walsh v. Medical Professional Liability Catastrophe Loss Fund*, 576 Pa. 72, 77 n. 8, 838 A.2d 692, 695 n. 8 (2003)). Contrary to the Fund's position, it seems reasonably clear to me that the *Walsh* footnote concerned the same subject as the text to which it was appended, *i.e.*, the general rule which had limited total payment by the Fund (including any delay-damages component) according to the statutory cap. *See Walsh*, 576 Pa. at 77, 838 A.2d at 695.[1] I believe that the Court was observing (albeit somewhat obliquely) that the Legislature, via Section 714(h)'s materially-identical predecessor, had altered this rule to require payment of delay damages

1. In this regard, the decision in *Lahav v. Main Line Ob/Gyn Associates, P.C.*, 556 Pa. 245, 727 A.2d 1104 (1999), applying an early version of the CAT Fund's enabling legislation, was to the effect that the statutory cap on the Fund's liability extends to delay damages. *See id.* at 252, 727 A.2d at 1107; *see also Walsh v. Medical Professional Liability Catastrophe Loss Fund.*, 576 Pa. 72, 77, 838 A.2d 692, 695 (2003) (citing *Lahav* for the proposition that the MCARE Fund's predecessor "will not be liable to the extent that [delay damages] exceed the $1,000,000 statutory cap.").

allocable to the Fund's *statutory* liability above and beyond such cap. *See id.* at 77 n. 8, 838 A.2d at 695 n. 8. Indeed, the subject of claims against the Fund grounded upon common-law indemnity does not surface in the *Walsh* Court's discussion until after the salient footnote and the text to which it bears relevance.

Finally, with regard to the majority's comments that Section 714(h) does not supersede the holdings of *Walsh, see* Majority Opinion, at 78–83, 84, 73 A.3d at 560–61, 563, I would merely clarify that the statute does supplant *Walsh's* recognition, derived from *Lahav*, that delay damages were subject to the statutory cap on the Fund's liability, under a predecessor scheme.