**Brogan v. Rosenn, Jenkins & Greenwald**

C.P. of Lackawanna County, No. 08 CV 6048

*Michael J. Kenny,* for plaintiffs.

*James J. Wilson,* for defendants Rosenn, Jenkins & Greenwald, LLP and David F. Chuff.

*David R. Cherundolo,* for defendants SBP Abstracting and Anthony J. Popeck.

*Stephen G. Bresset* and *Edward J. Hayes,* for defendant Conestoga Title Insurance Co.

NEALON, *J.,* January 31, 2014—In this civil action filed by property owners against their former counsel, title searcher and title insurance company for damages related to the landowners' purchase of real estate that, unbeknownst to them, was encumbered by a recorded

utility easement and accompanying building restriction, the former counsel and title insurer have filed motions for summary judgment. The defendant attorneys concede their negligence in failing to discover the duly filed utility easement prior to the closing, but contend that the property owners cannot recover damages from them since the property owners were contractually obligated to proceed forward with the closing even if their attorneys had detected the easement beforehand. The title insurer asserts that the landowners' claim is clearly not covered by the plain language of the title insurance policy inasmuch as the unfound utility easement does not constitute a defect in the title, and to the contrary, is expressly excluded from coverage by the terms of the policy.

The summary judgment exhibits indicate that the property's seller affirmatively represented in the land sale contract that there were no known restrictions on the use of the land. It is uncontroverted that the property is subject to a permanent prohibition against the construction of any building within the thirty foot wide easement traversing the property. Even if the seller's misrepresentation concerning land use restrictions was innocent, it would have furnished a basis for equitable rescission of the land sale contract if the utility easement had been discovered prior to the closing. Moreover, there are triable issues of fact as to whether the property owners would have waived certain contractual contingencies if their former counsel had timely advised them of the recorded easement. Therefore, factual issues exist relative to the question of causation, such that the defendant attorneys' motion for summary judgment will be denied.

The title insurance policy not only affords coverage for losses caused by any "defect" in the title, but also

covers damages related to an "encumbrance on the title." A permanent, utility easement/right-of-way, with its corresponding restriction upon the placement of structures within that right-of-way, constitutes an encumbrance on the title in question. Resolution of the issue of whether the landowners "assumed or agreed to" that encumbrance, so as to exempt coverage under a specific policy exclusion, will depend upon credibility determinations and factual findings that are reserved for the jury. Since the application of that policy exclusion cannot be decided as a matter of law, the title insurer's motion for summary judgment will also be denied.

## I. FACTUAL BACKGROUND

When the summary judgment record is examined in the light most favorable to the plaintiffs as the nonmoving parties, *see Lance v. Wyeth*, 2014 WL 260309, at * 12 (Pa. 2014) (summary judgment record must be viewed by the court in the light most favorable to the non-moving party), it reveals that in the fall of 2006, plaintiffs, Thomas Brogan and Wendy Brogan ("the Brogans"), undertook an effort to purchase property in the East Mountain section of Scranton as a site where they could build a retirement home near their family. The Brogans sought to purchase "excess acreage" in East Mountain in the hope that they could build their "dream house" there, subdivide the extra land, and sell those lots in order to fund the construction of their new home. (Docket entry no. 278, exhibit 2 at pp. 8, 52-53, 64). To that end, the Brogans retained a local realtor, Ronald Koldjeski, to locate available East Mountain property, and hired defendants, David F. Chuff, Esquire ("Chuff), and Rosenn Jenkins & Greenwald, LLP ("Rosenn"), to represent them in connection with that transaction. (*Id.* at pp. 8-9, 13-14; docket entry no. 278 at

¶ 1; docket entry no. 286 at ¶ 1).

The Brogans' realtor arranged for the Brogans to view 4.1 acres of vacant land on East Mountain Road that was owned by Douglas Pinnell ("Pinnell"). (Docket entry no. 278, exhibit 2 at pp. 9-10). The Brogans, their realtor and Pinnell viewed the property together in October 2006. (*Id.* at pp. 10-11). At that time, Mr. Brogan noticed the presence of a partially protruding, subterranean pipe on the property, and when he questioned Pinnell about the pipe, Pinnell replied that he "had no idea what it was." (*Id.* at pp. 12-14, 30). Mr. Brogan contacted Chuff concerning that pipe and asked him "to look into it" before the Brogans agreed to purchase the property. (*Id.* at pp. 15, 31). Shortly thereafter, Chuff advised Mr. Brogan that "there [we]re no records showing any pipe on the [Pinnell] property" and "[t]hat there was no one who had any rights" or "any ownership" interests with regard to Pinnell's land. (*Id.* at pp. 32-36, 55).

Chuff and Rosenn hired a title searcher, defendant, Anthony J. Popeck t/a SBP Abstracting ("Popeck"), to conduct a search of the title for Pinnell's property that was to be purchased by the Brogans, and that search was initially conducted between October 26, 2006, and November 2, 2006. (Docket entry no. 193, exhibit A at pp. 70-72, 156; docket entry no. 278 at ¶12; docket entry no. 286 at ¶12). On November 2, 2006, the Brogans executed an agreement of sale to purchase that property from Pinnell for the sum of $80,000.00.[1] (Docket entry

---

1. Pinnell had purchased the property from Anthony F. Tunis and Mary Tunis on June 14, 1991, for the sum of $33,000.00, (Lackawanna County Deed Book 1363 at pp. 486-489), and Anthony F. Tunis had purchased the property from Peter J. Phillips, Lillian Phillips, Carl P. Walsh and Eileen Walsh on June 19, 1973, for $6,500.00. (Lackawanna County Deed Book 801 at pp. 377-380). On March 29, 1988, Anthony F. Tunis

no. 278 at ¶¶ 4-5 & exhibit 1; docket entry no. 286 at ¶¶ 4-5). In addition, the Brogans retained a builder, Mr. Scott Binsack, who agreed to build their home and to purchase four subdivided lots from the land to be acquired by the Brogans. (Docket entry no. 278, exhibit 2 at pp. 24, 27-28, 65-67).

Under paragraph 8(A) of the Pinnell-Brogan agreement of sale, Pinnell represented that "[a]n off-Property source of water" was available for the property. (Docket entry no. 278, exhibit 1 at pp. 2-3). The agreement reflects that the Brogans expressly waived their option to make the purchase contingent upon "determining that the terms of connecting the property to an off-property water source are acceptable" and "receiving municipal approval for the connection of the property to a sewage disposal system." (*Id.* at pp. 3-4). In that regard, the Brogans also "agree[d] to the release set forth in paragraph 23 of this agreement," which states:

> Buyer hereby releases, quit claims and forever discharges [Pinnell], all brokers, their licensees, employees, and any officer or partner of any one of them and any other person, firm, or corporation who

---

granted a utility easement to the Pennsylvania Gas & Water Company ("PG&W") in exchange for the payment of $675.00. (Docket entry no. 262, exhibit 19). Mr. Tunis "irrevocably grant[ed] and convey[ed] unto [PG&W] the right to construct, operate, maintain and repair, and from time to time to construct, reconstruct and renew a pipeline and/or pipe-lines, including pipes, fixtures and apparatus in, upon, over and along the property..., and then, upon, over and along the roads, streets and highways adjoining the said property, including the right of ingress and egress to and from the said pipeline at all times for any of the purposes aforesaid." (*Id.* at p. 2). The utility easement specifically states that "[i]t is the intent of this instrument to grant a permanent right-of-way of thirty feet (30') in width," and more importantly to the case *sub-judice*, that "[i]t is understood and agreed no buildings or structures are to be built within the permanent right-of-way area." (*Id.* at pp. 2-3).

may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injuries and property damage and all of the consequences thereof, whether now known or not, which may arise from the presence of environmental hazards, any deficiencies in the on-site water service system, or any defects or conditions on the property. This release will survive settlement.

(*Id.* at pp. 3-4, 8).

Paragraph 14 of the agreement of sale addresses "land use restrcitons other than zoning," and in choosing one of five available responses, Pinnell answered "none known." (*Id.* at p. 6). As for the title to be conveyed, paragraph 12(A) of the agreement states:

The property is to be conveyed free and clear of all liens, encumbrances, and easements, excepting however the following: existing deed restrictions, historic preservation restrictions or ordinances, building restrictions, ordinances, easements of roads, easements visible upon the ground, *easements of record*, privileges or rights of public service companies, if any; otherwise the title to the above described real estate will be good and marketable and such as will be insured by a reputable Title Insurance Company at the regular rates.

(*Id.* at p. 5) (emphasis added). Subparagraph (D) of that section further provides that "[i]n the event [Pinnell] is unable to give a good and marketable title and such as will be insured by a reputable Title Company at the regular rates," the Brogans had the option of either "taking such title as [Pinnell] can give with no change to the purchase price," or "being repaid all monies paid by [the Brogans] to [Pinnell] on account of the purchase price and being

reimbursed by [Pinnell] for any costs incurred by [the Brogans] for any inspections or certifications obtained according to the terms of the agreement" for any title search, title insurance survey required by the title insurance company, and appraisal fees. (*Id.* at p. 6). In the event that the Brogans opted to demand repayment of those monies, the agreement distinctly stated that "there will be no further liability or obligation on either of the parties hereto and this agreement will be void."[2] (*Id.*)

In connection with the Brogans' purchase of Pinnell's property, their counsel secured a title insurance policy (Policy # 504608) from defendant, Conestoga Title Insurance Company ("Conestoga"), in the amount of $80,000.00. (Docket entry no. 250, exhibit C at p. 2). Pursuant to the terms of that policy, Conestoga afforded insurance to the Brogans "against loss or damage... sustained or incurred by," *inter alia*, "[a]ny defect in or lien or encumbrance on the title" to the property purchased. (*Id.* at p. 3). In the stated "Exclusions from coverage," section 3(a) of the Conestoga policy exempts coverage for "[d]efects, liens, encumbrances, adverse claims or other matters" that were "created, suffered, assumed or agreed to by the insured claimant." (*Id.* at p. 4). Schedule B of the policy sets forth additional "exceptions from coverage," and states that the "policy does not insure against loss or damage...which arise by reason of...[e]asements, or claims

---

2. The agreement of sale originally included a special provision stating that the " [p]roperty is to have access to power and public water and sewer." (*Id.* at p. 8). However, Pinnell later declined to abide by that clause and advised the Brogans that they "either had to buy the property without him...bringing in the utilities to [their] property, or there would be no sale." (Docket entry no. 278, exhibit 2 at p. 52). Since the Brogans had obtained a written confirmation from their builder, Mr. Scott Binsack, that he would provide access to "public water and sewer" for $25,000.00, the Brogans agreed to withdraw that contractual condition and to purchase the 4.1 acres for $80,000.00. (*Id.* at pp. 47-48, 53-54).

of easements, not shown by the public records." (*Id.* at p. 7).

It is undisputed that Chuff, Rosenn and Popeck failed to discover the duly recorded utility easement that had been filed by PG&W in 1988 and which prohibits the erection of any building or structure within the thirty (30) foot wide permanent right-of-way area. (Docket entry no. 278 at ¶12; docket entry no. 286 at ¶12). Allegedly unaware of the existence of that easement, the Brogans proceeded forward with the closing for their purchase of the property from Pinnell on January 5, 2007. (*Id.* at ¶ 11). In late January 2007, a prospective mortgage company advised Mr. Brogan that it would not lend money for a construction project involving the Brogans' builder, Scott Binsack, and suggested that the Brogans contact another builder, Mr. Kevin Conforti. (Docket entry no. 278, exhibit 2 at pp. 65-68). Conforti advised the Brogans that Binsack "was a con man and he was probably going to end up in jail," so the Brogans terminated their contract with Binsack and retained Conforti to build their home.[3] (*Id.* at pp. 69-70).

---

3. By his own admission, Binsack originally operated home-building businesses in Monroe County, but after he "pled guilty to a number of theft charges related to his business in 2001, [he] served three years in prison." *Binsack v. Lacka. Co. District Attorney's Office*, 2009 WL 3739408, at * 1 (M.D. Pa. 2009); *Binsack v. Lacka. Co. District Attorney's Office*, 2009 WL 539521, at * 1 (M.D. Pa. 2009). Upon his "release on parole, [Binsack] took up residence in Clarks Summit, Pennsylvania, and resumed his business career." *Id.* Binsack later pled *nolo contendere* to a host of bad checks offenses, and was sentenced by Judge Vito P. Geroulo in 2010 to be incarcerated for a minimum period of 15 months, 14 days to a maximum term of 30 months, 28 days. *See Com. v. Binsack*, No. 08 CR 390, 391, 392, 393, 394, 395, 396, 397, 398, 1991, 1992, 1993, 1994 (Lacka. Co.). While incarcerated in state prison, Binsack filed federal civil rights litigation against prosecutors, police, banks, municipalities, a newspaper, and prison employees. *See, e.g., In re Binsack*, 446 Fed. Appx. 445 (3d Cir. 2011); *Binsack v. Lacka. Co. District Attorney's Office*, 2011 WL 5840314 (M.D. Pa. 2011); *Binsack v. Lacka. Co. District Attorney's Office*, 2009 WL 424715 (M.D. Pa. 2009); *Binsack v. Lacka. Co. District Attorney's Office*, 2008 WL 4372788 (M.D. Pa.

While exploring the connection of public utilities to the Brogans' property, Conforti contacted "PA One Call" and was informed of the existence of PG&W's 42" water line and permanent easement. (*Id.* at pp. 75-76). Mr. Brogan conveyed that fact to Chuff, (*Id.* at pp. 76-77), who later advised Brogan that he had "checked into it" again and that "there [wa]s no water line on [the Brogans'] property." (*Id.* at. p. 78). Upon contacting a representative of PG&W's successor company, Pennsylvania American Water Company, Brogan learned that the utility company had a duly recorded easement and right-of-way, that the Brogans would have to install their utility access "eight to ten feet under the water main, and that the sewer and water [pipes] couldn't be together." (*Id.* at pp. 81-83). According to an estimate that the Brogans secured from Linde Corporation, it will cost $224,765.00 for the Brogans to connect their water and sewer service to their property in that manner. (Docket entry no. 278, exhibit 2 at pp. 86-88; docket entry no. 286, exhibit 6).

The Brogans thereafter presented a title insurance claim to Conestoga which denied their claim by letter dated May 23, 2008. (Docket entry no. 250 at ¶ 2; docket entry no. 262 at ¶2). In its denial letter to the Brogans, Conestoga advised the Brogans that their complaint concerned "marketability of title, rather than a defect in title." (Docket entry no. 250, exhibit A at p. 1). Citing *Rood v. Commonwealth Land Title Insurance Company*, 936 A.2d 488 (Pa. Super. 2007), *app. denied*, 599 Pa. 694, 960 A.2d 841 (2008), Conestoga stated that the title insurance policy only insured title defects, not conditions where merely affected the use or economic marketability of the property. (*Id.* at pp. 1-2). Additionally, Conestoga

2008).

maintained that the Brogans' claim was expressly excluded by section 3(a) of the policy which exempts coverage for defects or encumbrances that were "assumed or agreed to by the insured claimant." (*Id.* at p. 2).

The Brogans commenced this litigation against their former attorneys, Chuff and Rosenn, title searcher, Popeck, and title insurer, Conestoga, on September 5, 2008. (Docket entry no. 1). In their complaint, the Brogans assert legal malpractice claims against Chuff and Rosenn, a negligent supervision claim against Rosenn with respect to the conduct of Popeck, and causes of action against Conestoga for breach of contract, negligent misrepresentation and bad faith. (Docket entry no. 11). The Brogans claim damages related to their land's decreased buildable space and increased development costs attributable to the undetected easement. (*Id.*). Chuff, Rosenn and Conestoga have now filed motions for summary judgment seeking to dismiss all claims against them. (Docket entry nos. 250, 278).

In their summary judgment submissions, Chuff and Rosenn cite paragraph 12(A) of the agreement of sale addressing the quality of the title to be conveyed, and argue that "easements of record are excepted from this warranty" of title. (Docket entry no. 306 at p. 8). Chuff and Rosenn posit that "[b]ecause the easement was an easement of record, by virtue of paragraph 12 of the contract, [the Brogans] would have been unable to avoid going through with the contract, even if the easement had been discovered before closing." (Docket entry no. 278 at ¶15). Based upon that reasoning, Chuff and Rosenn contend that the Brogans "will be unable to establish that the alleged breach by [Chuff and Rosenn], i.e., the alleged failure to do a proper title search and the failure to discover the water main easement, caused them damage."

(Docket entry no. 306 at p. 9). In that vein, Chuff and Rosenn submit that as a result of the Brogans' waiver of their right to make the purchase contingent upon an acceptable water connection and municipal approval for sewage disposal connection, the Brogans "waived any of the contract provisions which would have afforded them a basis to avoid the contract." (*Id.* at p. 9).

Conestoga's motion for summary judgment references the same contractual provisions governing the waiver of contingencies and the exclusion of "easements of record" from the warranty of title representation. (Docket entry no. 250 at ¶¶ 11-17). Conestoga advances three arguments in support of its request for summary judgment. First, in seeking to dismiss the breach of contract claim, it maintains that its "liability to the Brogans must lie with and under the terms of the policy of title insurance issued," and that "[t]he presence of a water pipe is not a title defect and does not affect the marketability of the property." (*Id.* at ¶¶ 8,26). Second, as an alternate ground for dismissing the contract claim, Conestoga alleges "[t]hat the Brogans were aware of the existence of the water pipe" and "of any and all utility access issues to the property before the sale," as a result of which coverage is excluded by Section 3(a) of the policy exempting encumbrances that were "assumed or agreed to by the insured claimant." (*Id.* at ¶¶ 18, 21, 28). Last, with respect to the Brogans' bad faith claim under 42 Pa.C.S.A. § 8371, Conestoga argues "[t]hat the claim of the Brogans for 'bad faith' is controlled by the policy, and in the absence of any liability under the policy, [Conestoga] is entitled to judgment as a matter of law as to the claim of bad faith." (*Id.* at ¶29). Conestoga's summary judgment motion does not seek to dismiss the Brogans' claim for negligent misrepresentation.

In opposing the case dispositive motion filed by Chuff and Rosenn, the Brogans submit that their former counsel "represented the Brogans, and any alleged inability of the Brogans to have avoided the property purchase does not absolve [Rosenn] and Chuff of liability." (Docket entry no. 314 at p. 35) (citing Am.Jur.2d, Attorneys at Law, § 207). The Brogans counter Conestoga's summary judgment request by arguing that "[t]he existence of the [utility easement and right-of-way] creates a defect in the title to the property." (*Id.* at 17) (citing *Overholtzer v. Northern Counties Title Ins. Co.*, 116 Cal. App.2d 113, 253 P.2d 116 (1953)). Following the completion of oral argument on December 17, 2013, the motions for summary judgment filed by Chuff, Rosenn, and Conestoga were submitted for a decision.

## II. DISCUSSION

### STANDARD OF REVIEW

Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Clausi v. Stuck*, 74 A.3d 242, 247-248 (Pa. Super. 2013). The party seeking summary judgment bears the burden of proving the absence of a genuine issue of fact and the movant's entitlement to judgment as a matter of law, *Stimmler v. Chestnut Hill Hospital*, 602 Pa. 539, 554, 981 A.2d 145, 154 (2009), and in making that determination, the record must be viewed in the light most favorable to the nonmoving party, with all doubts as to the existence of a genuine issue of material fact being resolved against the movant. *Kinney-Lindstrom v. Medical Care Availability and Reduction of Error Fund*, 73 A.3d 543, 551 (Pa. 2013); *Sovereign Bank v. Gawron*, 13 Pa.

D. & C.5th 71, 77 (Lacka. Co. 2010). Summary judgment is appropriate "where the right to such judgment is clear and free from all doubt." *Lynn v. Nationwide Insurance Company*, 70 A.3d 814, 818 (Pa. Super. 2013) (quoting *Toy v. Metropolitan Life Insurance Company*, 593 Pa. 20, 34, 928 A.2d 186, 195 (2007)).

## (B) LEGAL MALPRACTICE CAUSATION

To establish a claim of legal malpractice against an attorney, the aggrieved client must demonstrate: (1) employment of the attorney or some other basis for a duty; (2) the failure of the attorney to exercise the requisite skill and knowledge; and (3) that such negligence was the proximate cause of damage to the former client. *Kituskie v. Corbman*, 552 Pa. 275, 281, 714 A.2d 1027, 1029 (1998); *Jones v. Bressett*, 47 Pa. D. & C.4th 60, 70 (Lacka. Co. 2000). For purposes of their motion for summary judgment, Chuff and Rosenn acknowledge the existence of an attorney-client relationship with the Brogans and the failure of Chuff and Rosenn to exercise the requisite skill and care in discovering the recorded utility easement prior to the closing. Chuff and Rosenn contend, however, that the Brogans cannot establish any damage caused by their professional negligence since the terms of the agreement of sale obligated the Brogans to proceed forward with the closing even if their counsel or title searcher detected the utility easement and informed the Brogans of it. (Docket entry no. 306 at pp. 8-9).

In their brief in opposition to the foregoing causation contention, the Brogans focus their argument on a discussion of negligence rather than causation. (Docket entry no. 314 at pp. 33-43). In that respect, the Brogans assert:

> [Rosenn] and Chuff are wrong as a matter of law...
> that the Brogans suffered no damages as a result of
> [Rosenn] and Chuff's failure to discover the easement.
> The issue in [this] litigation is their negligence in not
> discovering and disclosing [PG&W's] duly publicly
> recorded easement/right-of-way on the Property, even
> though Chuff admits Brogan told him about the pipe
> and Chuff assured him the records revealed nothing
> about it.

(*Id.* at p. 34). The Brogans aptly note that negligence and causation determinations are generally jury questions, but summarily posit that "[r]easonable jurors could conclude that [Rosenn] and Chuff's negligence was the cause of the Brogans' damages." (*Id.* at p. 38)

The argument that the Brogans would have been unable to rescind the agreement of sale upon the timely discovery of the utility easement and building restriction is unsupported by Pennsylvania law. Our common law has long required sellers of real estate to disclose material defects in the property being conveyed. *See Adams v. Euliano*, 299 Pa. Super. 348, 352, 455 A.2d 788, 791 (1982) (finding that "the lower court incorrectly held that no cause of action would lie if the seller was proven to be under a duty to know about a dangerous condition in the building and innocently failed to disclose information to which that duty applied."); *Glanski v. Ervine*, 269 Pa. Super. 182, 192, 409 A.2d 425, 430 (1979) (seller liable to buyer for failing to disclose termite infestation of property, even if seller's misrepresentation was innocent). The Real Estate Seller Disclosure Law ("RESDL"), 68 Pa.C.S.A. §§ 7301 et seq., further imposes a duty upon a seller of property to disclose any "[l]egal issues affecting title or *that would interfere with use and enjoyment of the*

*property.*" 68 Pa.C.S.A. § 7304(b)(16) (emphasis added). Relying upon the mandatory disclosure requirements of the RESDL, the Superior Court has held "that under common law fraud a seller of real estate is only liable for failing to reveal objective material defects." *Milliken v. Jacono*, 60 A.3d 133, 141 (Pa. Super. 2012) (seller not liable for failure to disclose that murder/suicide of prior owners had occurred in house since "[w]hile the murder/ suicide may have been subjectively material to Buyer's decision,...[p]sychological damage to real estate does not constitute a defect that the law is presently prepared to recognize as material.").

There is no indication in the summary judgment record that Pinnell was aware of the utility easement and its concomitant restriction on the construction of buildings, and that he intentionally concealed that land use restriction from the Brogans.[4] However, in Pennsylvania, "a misrepresentation may be actionable pursuant to three theories: Intentional Misrepresentation, Negligent Misrepresentation, and Innocent Misrepresentation." *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). The elements of intentional misrepresentation are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

---

4. Chuff and the Brogans agree that Chuff advised Mr. Brogan that Pinnell had been untruthful with them by falsely stating that Pinnell's mortgage with Anthony F. Tunis had been satisfied and that Mr. Tunis was deceased. (Docket entry no. 263 at pp. 85-86; Docket entry no. 278, exhibit 2 at pp. 56-57,59). Chuff told Brogan that they could not "trust Doug Pinnell," (Docket entry no. 263 at pp. 86,217), since "Anthony Tunis was alive," "there was no satisfaction" filed relative to the mortgage, and Pinnell "had lied" to Chuff and the Brogans. (Docket entry no. 278, exhibit 2 at pp. 56-57). After Pinnell subsequently secured an executed satisfaction of the mortgage from Mr. Tunis, the Brogans and Chuff proceeded forward with the closing. (*Id.* at pp. 57-58).

(4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance. *Weston v. Northampton Personal Care. Inc.*, 62 A.3d 947, 960 (Pa. Super. 2013), *app. denied*, 79 A.3d 1099 (Pa. 2013); *Busy Bee, Inc. v. Corestates Bank. N.A.*, 67 Pa. D. & C.4th 496, 512 (Lacka. Co. 2004). Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 466, 866 A.2d 270, 277 (2005); *Eastern Roofing Systems. Inc. v. Cestone*, 24 Pa. D. & C. 5th 394, 413 (Lacka.Co. 2012). "The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz*, 556 Pa. at 501, 729 A.2d at 561; *Com. v. TAP Pharmaceutical Products. Inc.*, 36 A.3d 1112, 1143 (Pa. Cmwlth. 2011).

Unlike claims for intentional or negligent misrepresentation which may serve as the basis for tort liability on the part of a seller of real estate, "[a] claim for an 'innocent' misrepresentation has been recognized in this Commonwealth in order to rescind a real estate transaction that is based upon a material misrepresentation even if the misrepresentation is innocently made." *Bortz*, 556 Pa. at 505, 729 A.2d at 563, 564 (citing *DeJoseph v. Zambelli*, 392 Pa. 24, 139 A.2d 644 (1958)). *Accord R*

& R Capital, LLC v. Merritt, 632 F. Supp. 2d 462, 479 (E.D. Pa. 2009) ("A party seeking to void a contract can do so...by establishing...that it was induced to enter the contract by a material misrepresentation, even if that misrepresentation was made innocently."), *aff'd*, 426 Fed. Appx. 85 (3d Cir. 2011), *cert. denied*, 132 S.Ct. 763 (U.S. 2011). Such equitable rescission is premised upon the principle that a seller of real estate "has no right to make a statement of which [s]he has no knowledge." *Bortz*, 556 Pa. at 506, 729 A.2d at 564 (quoting *LaCourse v. Kiesel*, 366 Pa. 385, 388, 77 A.2d 877, 879 (1951)). *See also Miller v. Bare*, 457 F. Supp. 1359, 1361 (W.D. Pa. 1978) (fact that seller's misrepresentation regarding property's boundary lines was innocent was of no consequence, since "[i]t is now well established in Pennsylvania that an innocent misrepresentation of a material fact by a vender that is justifiably relied on by a purchaser is a basis for rescission of a contract for sale of land."). Thus, although an innocent misrepresentation does not create tort liability for damages on the part of the seller of real estate, *see Growall v. Maietta*, 931 A.2d 667, 674 (Pa. Super. 2007), *app. denied*, 597 Pa. 717, 951 A.2d 1164 (2008), it may operate as "an equitable doctrine based upon contract principles supporting equitable rescission to make a contract voidable by the innocent party, where appropriate, as set forth in *DeJoseph*, *supra* and *LaCourse*, *supra*." *Bortz*, 556 Pa. at 506-507, 729 A.2d at 564.

Although Pinnell affirmatively represented in paragraph 14 of the agreement that there were no known restrictions on the use of the land that he was conveying to the Brogans, (Docket entry no. 278, exhibit 1 at p. 6), it is uncontroverted that the property was and is subject to a permanent prohibition against the construction of

any building or other structure within the 30 foot wide easement spanning the property. (Docket entry no. 262, exhibit 19 at pp. 2-3). Assuming *arguendo* that Pinnell's misrepresentation in that respect was innocent, the prompt discovery of the utility easement by Chuff and Rosenn would have afforded the Brogans a basis for rescinding the agreement of sale prior to closing due to Pinnell's innocent misrepresentation. *See Bortz, supra*; *DeJoseph, supra*. Therefore, contrary to the causation argument advanced by Chuff and Rosenn in their motion for summary judgment, their negligence was arguably the proximate cause of harm to the Brogans.

The assertion by Chuff and Rosenn that, as a matter of law, proximate causation is negated by the Brogans' waiver of the contractual contingencies for acceptable water source connection and municipal approval for sewage disposal connection is likewise devoid of merit. The defense argument in that regard ignores the fact that the Brogans were unaware of PG&W's permanent easement and building restriction at the time that they agreed to waive those contingencies based upon the advice of their counsel, Chuff and Rosenn. If Chuff and Rosenn had properly discovered that easement and building restriction and timely advised the Brogans of the same, the Brogans presumably would not have waived those contingencies and instead would have insisted upon acceptable water and sewage connections. Thus, the Brogans may assert at trial that the failure of Chuff and Rosenn to detect the easement and land use limitation caused the Brogans to waive the contractual contingencies in question.

Triable issues of fact exist as to whether the Brogans would have waived those contingencies and proceeded forward with the closing upon being informed by their

counsel of the utility easement and building restriction, as well as the projected additional cost of installing their utility access eight to ten feet below the PG&W water main. Factual determinations must also be made as to whether the Brogans would have signed the agreement on November 2, 2006, or rescinded that contract prior to the closing on January 5, 2007, if they had been properly advised of PG&W's easement. Since those fact-specific causation issues must be addressed by the jury, the motion for summary judgment filed by Chuff and Rosenn will be denied.[5]

## (C) TITLE INSURANCE COVERAGE

Conestoga first contends that the Brogans' claim is not

---

5. The release clause contained in paragraph 23 of the agreement of sale does not alter that conclusion. It is axiomatic that releases are construed in accordance with traditional principles of contract law, *Maloney v. Valley Medical Facilities. Inc.*, 946 A.2d 702, 706 (Pa. Super. 2008), *aff'd*, 603 Pa. 399, 984 A.2d 478 (2009), and "the effect of a release is to be determined by the ordinary meaning of its language." *Pennsbury Village Associates. LLC v. McIntyre*, 608 Pa. 309, 322, 11 A.3d 906, 914 (2011). A release agreement must be strictly construed against the party claiming protection under it, and the burden of establishing immunity is upon the party invoking protection under the exculpatory clause. *Tayer v. Camelback Ski Corp. Inc.*, 616 Pa. 385, 394, 47 A.3d 1190, 1196(2012). In construing a release agreement, "it is crucial that a court interpret a release so as to discharge only those rights intended to be relinquished." *Vaughn v. Didizian*, 436 Pa. Super. 436, 439, 648 A.2d 38, 40 (1994); *Moses Taylor Hospital v. Carnevale*, 2011 WL 7177006, at * 6 (Lacka. Co. 2011).

The clear wording of paragraph 23 reflects an intent to release Pinnell, his broker, employer or agent and other individuals "who may be liable by or through" Pinnell from claims for "personal injuries and property damage" arising from "environmental hazards, any deficiencies in the on-site water service system, or any defects or conditions on the property." (Docket entry no. 278, exhibit 1 at p. 8). Paragraph 23 does not expressly or impliedly address the tort or contract liability of Chuff, Rosenn or Conestoga arising from the failure to discover the recorded easement/building restriction or to insure the Brogans against an encumbrance on the title. Since the language of paragraph 23 does not reflect an intent to discharge Chuff, Rosenn or Conestoga from any such liability, that release provision is of no consequence in this matter.

covered by the plain language of the title insurance policy since the existence of a water pipe does not constitute a title defect that affects the marketability of the Brogans' title to the property. The Brogans allege that Conestoga is "deliberately misinterpreting not only the terms of a contract that Conestoga itself drafted, but also the law." (Docket entry no. 314 at p. 60). Citing appellate case law from California, Hawaii, Illinois, and Wisconsin, the Brogans assert that the presence of the utility easement "creates a defect in the title to the property."[6] (*Id.* at p. 17).

"The interpretation of an insurance contract regarding the existence or nonexistence of coverage is generally performed by the court." *Donegal Mutual Insurance Company v. Baumhammers*, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); *AJT Properties, LLC v. Lexington Insurance Company*, 25 Pa. D. & C.5th 302, 319 (Lacka. Co. 2012). Insurance policies are contracts, and as such, are governed by the rules of contract interpretation. *Miller v. Poole*, 45 A.3d 1143, 1146 (Pa. Super. 2012). "Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Baumhammers*, 595 Pa. at 155, 938 A.2d at 290; *Babcock & Wilcox, Co. v. American Nuclear Insurers*, 76 A.3d 1, 10 (Pa. Super. 2013). When the language of a policy is clear and unambiguous, the court must give effect to that language. *Lexington Ins. Co. v. Charter Oak Fire Ins. Co.*, 2013 WL 5935237, at * 4

---

6. The Brogans' brief quotes the decisions in *Overholtzer v. Northern Counties Title Ins. Co.*, 116 Cal. App. 2d 113, 253 P.2d 116 (1953), *Create 21 Chuo. Inc. v. Southwest Slopes. Inc.*, 81 Hawai'i 512, 918 P.2d 1168 (Ct. App. 1996), *Monti v. Tangora*, 99 Ill. App. 3d 575, 54 Ill. Dec. 732, 425 N.E.2d 597 (1981), and *First American Title Ins. Co. v. Dahlmann*, 291 Wis.2d 156, 715 N.W.2d 609 (2006). (*Id.* at pp. 17, 20-21).

(Pa. Super. 2013). The Brogans do not contend that any pertinent language in Conestoga's policy is ambiguous. (Docket entry no. 314 at pp. 11, 14, 20-28).

"Generally speaking, a title insurance policy is subject to the same rules of construction that govern other insurance policies," and "[a]lthough a title insurance policy is to be liberally construed in favor of the insured, this court must consider the language of the policy and the expectation of the insured so as to give reasonable meaning to its terms." *Rood v. Commonwealth Land Title Insurance Company*, 936 A.2d 488, 491 (Pa. Super. 2007), *app. denied*, 599 Pa. 694, 960 A.2d 841 (2008). "[A]n insured under a title insurance policy is entitled to recover only for losses as a result of defects in the title caused by liens and encumbrances." *Trigiani v. American Title Insurance Co.*, 392 Pa. Super. 427, 433, 573 A.2d 230, 232 (1990). Section 910-1(1) of the Pennsylvania Title Insurance Company Act, 40 P.S. § 910-1(1), defines "title insurance" as "insuring, guaranteeing or indemnifying against loss or damage suffered by owners of real property...by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said real property; guaranteeing, warranting or otherwise insuring the correctness of searches relating to the title to real property...." *White v. Conestoga Title Ins. Co.*, 617 Pa. 498, 53 A.3d 720, 722 n. 4 (2012) (quoting 40 P.S. §910-1(1)).

Relying upon *Rood, supra.* Conestoga asserts that the presence of a utility pipe on the Brogans land may adversely affect the "value of the property," but does not constitute "a defect in title which would preclude alienability." (Docket entry no. 301 at p. 12). In *Rood*, the insured presented a title insurance claim upon discovering an abandoned septic tank on his property. Noting that title

insurance "does not protect against any claim arising from any physical condition concerning the property, which in this case was a septic tank underneath the realty," the Superior Court reasoned "that while appellant's property may be unmarketable due to the existence of the septic tank, the title to the property is not." *Rood*, 936 A.2d at 495-496. In finding that the "abandoned septic tank does not qualify as a 'defect, lien or encumbrance,'" the *Rood* court stated that "[t]he fact that the abandoned septic tank may diminish the value of his property is not reflective of whether appellant has good and marketable title to the property." *Id.* at 496. As support for that conclusion, it observed that "the duty of the title insurance company to search is restricted to those 'public records' which affect the title to the property, as that term has traditionally been understood to encompass, for example, the office of the recorder of deeds and the office of the prothonotary for judgments and liens." *Id.*

Conestoga's reliance upon *Rood* is misplaced. As per the unambiguous language of Conestoga's own policy, Conestoga furnished insurance against any loss or damage resulting not only from any "defect in or lien on the title...," but also from any "encumbrance on the title." (Docket entry no. 250, exhibit C at p. 2). "Encumbrance is a broad term and has been defined as 'every right or interest in the land which may subsist in third persons to the diminution of the value of the land, but consistent with the passing of the fee by the conveyance." *Leh v. Burke*, 231 Pa. Super. 98, 111, 331 A.2d 755, 762 (1974) (quoting *Ritter v. Hill*, 282 Pa. 115, 118, 127 A.455, 456 (1925)). It has long been recognized in Pennsylvania that an easement or right of way agreement giving a utility company the right to erect utility equipment across, under and along property

constitutes an encumbrance in contravention of a land sale contract requiring the seller to furnish title free and clear of all encumbrances. *See Volkert v. Swan*, 197 Pa. Super. 576, 580-582, 179 A.2d 274, 276-277 (1962). *See also Ziskind v. Bruce Lee Corp.*, 224 Pa. Super. 518, 521-523, 307 A.2d 377, 379 (1973) (citing *Volkert* and holding that right-of-way easements were "encumbrances" within the meaning of seller's covenant to convey title "clear of all encumbrances," thereby precluding enforcement of land sale contract where such encumbrances had not been expunged from title prior to closing); *Rose v. Mitsubishi International Corp.*, 423 F. Supp. 1162, 1167 (E.D. Pa. 1976) (stating that, under *Volkert*, "a purchaser of land is not required to take title offered when an easement exists which is a breach of a covenant for a conveyance free from encumbrances."); 6 Summ. Pa. Jur. 2d property § 8:80 (2d ed.) ("An easement that precludes the full enjoyment of land which a vendor has contracted to convey constitutes an encumbrance within the meaning of an express or implied covenant or obligation to convey property free and clear of encumbrances.").

"Contracts of professional title insurance companies, being ordinarily in terms prescribed by themselves, should be strictly construed in favor of the buyer." *Rood*, 936 A.2d at 493. PG&W's permanent easement and right-of-way, together with its accompanying building restriction, qualify as encumbrances on the title that was conveyed to the Brogans by Pinnell. *See Ziskind, supra*; *Volkert, supra*. Unlike the abandoned septic tank in *Rood*, PG&W's easement and land use restriction were discoverable via a diligent search of "public records" in "the office of the recorder of deeds," pursuant to "the duty of the title insurance company to search" those records.

*Rood,* 936 A.2d at 496. Hence, based upon the plain and unambiguous language of Conestoga's policy, and the interpretation of the phrase "encumbrance on the title" as formulated by decisional precedent, PG&W's permanent easement constitutes an encumbrance on the title that Pinnell furnished to the Brogans and falls within the general coverage provisions of Conestoga's policy.[7]

Conestoga alternatively argues that coverage is expressly excluded by section 3(a) of the policy which excludes coverage for "[d]efects, liens, encumbrances, adverse claims or other matters" that were "assumed or agreed to by the insured claimant." (Docket entry no. 250, exhibit C at p. 4). Conestoga contends that "[b]eginning in October 2006, Thomas and Wendy Brogan were aware of the presence of a pipe on the property, their builder, Scott Binsack, was aware, the grantor, Douglas Pinnell, was aware, the real estate agent, Ron Koldjeski, was aware, as was their attorney, David Chuff." (Docket entry no. 301 at pp. 4-5). In reply, the Brogans reference insurance agency law and assert that "[o]nce the Brogans informed Attorney Chuff about the existence of the pipe, Conestoga was informed."[8] (Docket entry no. 314 at p. 12).

---

7. There is no dispute that Popeck, Chuff and Rosenn failed to discover the duly recorded utility easement and building restriction during their title search. It bears noting that, as quoted above, the Pennsylvania Title Insurance Company Act defines "title insurance" as "insuring the correctness of searches relating to the title to real property." 40 P.S. § 910-1(1).

8. As support for their agency proposition, the Brogans cite *Francois v. Automobile, Ins. Co. of Hartford. Conn.,* 349 Pa. 360, 37 A.2d 525 (1944) where the Supreme Court of Pennsylvania held that "[t]he knowledge of this agent was tantamount to knowledge of the defendant company, [citation omitted], and when the policy was issued without application and the agent authorized by the company to write the policy knows that one of its conditions is inconsistent with the facts and the insured has been guilty of no fraud or misrepresentation, the company is estopped from setting up the breach of said condition." *Id.* at 363,37 A.2d at 527. The parties' summary judgment submissions indicate that

As a general rule, "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." *McEwing v. Lititz Mutual Insurance Company*, 77 A.3d 639, 646 (Pa. Super. 2013) (quoting *Betz v. Erie Insurance Exchange*, 957 A.2d 1244, 1256 (Pa. Super. 2008)). However, where an insurer relies on a policy exclusion as the basis for its denial of coverage, the insurer has asserted an affirmative defense and, as a result, bears the burden of proving such defense. *Swarner v. Mutual Benefit Group*, 72 A.3d 641, 645 (Pa. Super. 2013); *Housing and Redevelopment Insurance Exchange v. Lycoming County Housing Authority*, 58 Pa. D. & C.4th 321, 348 (Lacka. Co. 2001), *aff'd*, 809 A.2d 1096 (Pa. Cmwlth. 2002). "Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured." *Swarner, supra.*

Conestoga's argument equates the Brogans' awareness of the presence of a pipe with their purported knowledge of the utility easement and land use restriction and their acquiescence to the building limitation. Brogan has testified that when he asked Pinnell about the pipe in October 2006, Pinnell stated that he "had not idea what it was." Brogan has also claimed that Chuff advised him prior to the execution of the agreement of sale, and both before

Chuff was merely an "approved attorney" for Conestoga. (Deposition of David F. Chuff dated 9/17/12 at pp. 14-17, 29-30, 252, exhibits 1, 18). Under section 910-1(7) of the Title Insurance Company Act, an "approved attorney" is defined as "an attorney at law in good standing upon whose examination of title and report of title thereon a title insurance company may issue a policy of title insurance." 40 P.S. § 910-1(7). Section 910-24 of that act addresses title insurance agents who are identified as people, corporations or other legal entities who are duly authorized to perform certain acts "on behalf of the title insurer." *See* 40 P.S. § 910-24(a)(l)-(2). However, in defining a title insurance "agent," the act expressly states "[t]he word 'agent' shall not include approved attorneys...." 40 P.S. § 910-24(a).

and after the ensuing closing, that there was no record of a pipe on the property or any recorded ownership interest in that pipe. Chuff has a materially different recollection of his discussions with Brogan, and does not agree that he was informed of the pipe and advised Brogan in advance of the contract execution that there was no public record of the pipe or its owners. (Chuff depo., at pp. 74-75, 104-107, 110-111, 252-253, 271-272, 283-284, 307-315, 321-323). If the jury accepts Brogan's testimony as credible, it may conclude that PG&W's encumbrance on the title was not "assumed or agreed to" by the Brogans.

Consequently, it cannot be declared as a matter of law that section 3(a) of Conestoga's policy excludes title insurance coverage in this case. It will be the prerogative of the jury to weigh the credibility of Brogan and Chuff, and determine whether the Brogans assumed or agreed to PG&W's encumbrance on the title. If the jury answers that question in the affirmative, coverage will be excluded by section 3(a) of the policy. In the interim, however, Conestoga's motion for summary judgment will be denied due to the existence of a genuine issue of material fact with respect to the applicability of that policy exclusion. *See State Farm Fire & Casualty Company v. DeCoster*, 67 A.3d 40, 50 (Pa. Super. 2013) (reversing entry of summary judgment and holding that applicability of coverage would "depend on the finder of fact's conclusions" as "to whether DeCoster's conduct was intentionally wrongful under applicable tort law.").

### (D) BAD FAITH CLAIM

Conestoga also seeks to dismiss the Brogans' first party bad faith liability claim under 42 Pa.C.S.A. § 8371. "The bad faith statute 'authorizes courts, which find that an

insurer has acted in bad faith towards its insured, to award punitive damages, attorneys' fees, interest and costs.'" *Rutkowski v. Allstate Insurance Company*, 69 Pa. D. & C.4th 10, 36 (Lacka. Co. 2004) (quoting *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 403, 787 A.2d 376, 386 (2001)). To succeed with a statutory bad faith claim, the insured must establish that: (1) the insurer did not have a reasonable basis for denying benefits under the policy; and (2) the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *Grossi v. Travelers Personal Insurance Company*, 79 A.3d 1141, 1148 (Pa. Super. 2013); *Smalanskas v. Indian Harbor Insurance Company*, 2008 WL 3889290, at * 7 (Lacka. Co. 2008), *app. denied*, 970 A.2d 490 (Pa. Super. 2009). Bad faith must be established by clear and convincing evidence. *Johnson v. Progressive Company*, 987 A.2d 781, 784 (Pa. Super. 2009); *McAndrew v. Donegal Mutual Insurance Company*, 56 Pa. D. & C.4th 1, 11 (Lacka. Co. 2002).

In requesting summary judgment with respect to the Brogans' bad faith claim, Conestoga submits "[t]hat the claim of the Brogans for 'bad faith' is controlled by the policy and in the absence of any liability under the policy, [Conestoga] is entitled to judgment as a matter of law as to the claim of bad faith." (Docket entry no. 250 at p. 5). In short, Conestoga contends that since it is entitled to summary judgment on the Brogans' breach of contract claim, judgment must also be entered in its favor as to the Brogans' bad faith claim. Because Conestoga is mistaken in that regard, its motion for summary judgment will also be denied relative to the Brogans' bad faith claim. *See Admaski v. Allstate Insurance Company*, 738 A.2d 1033, 1039 n. 5 (Pa. Super. 1999), *app. denied*, 563 Pa.

655, 759 A.2d 381 (2000); *Nealy v. State Farm Mutual Automobile Insurance Company*, 695 A.2d 790, 793 (Pa. Super. 1997), *app. denied*, 553 Pa. 690, 717 A.2d 1028 (1998). An appropriate order follows.

## ORDER

And now, this 31st day of January, 2014, upon consideration of the motion for summary judgment of defendants, David F. Chuff, Esquire, and Rosenn, Jenkins & Greenwald, LLP, and the motion for summary judgment of defendant, Conestoga Title Insurance Company, the exhibits and memoranda of law submitted by the parties, and the oral argument of counsel on December 17, 2013, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. The motion for summary judgment of defendants, David F. Chuff, Esquire, and Rosenn, Jenkins & Greenwald, LLP, is denied; and

2. The motion for summary judgment of defendant, Conestoga Title Insurance Company, is denied.